DaNell Bartunek, appellee, v.
State of Nebraska, appellant.
666 N.W.2d 435

Filed July 25, 2003.   No. S-02-710.

Don Stenberg, Attorney General, and Melanie J. Whittamore-Mantzios for appellant.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, and Nelson O. Tyrone III, of Garland, Samuel & Loeb, for appellee.

Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Gerrard, J.

## NATURE OF CASE

DaNell Bartunek was assaulted in her home by George Andrew Piper, her former boyfriend, who was a convicted felon on probation at the time of the assault. Bartunek sued the State for failing to properly supervise Piper's behavior and was awarded damages in the sum of $300,000 by the district court. The dispositive question presented in this appeal is what duty is owed by the State to protect individual citizens from harm caused by the criminal conduct of probationers the State is charged with supervising.

## BACKGROUND

Piper was convicted in 1997, pursuant to a no contest plea, of possession of burglary tools and criminal trespass, and placed by the district court on intensive supervision probation (ISP). ISP was created in 1990 to relieve prison overcrowding by using electronic monitoring to supervise probationers in the community. ISP is intended for those who do not need incarceration, but are not suitable for traditional probation. ISP officers have more frequent contact with the probationers assigned to them and are on call 24 hours a day via pager.

After his release from jail, Piper lived with Bartunek and her two children from a prior relationship. Piper and Bartunek met

with Fred Snowardt, the ISP officer to whom Piper was assigned, in order to establish and review the terms of Piper's electronic monitoring program. Piper's order of probation set forth several requirements, including that he refrain from unlawful, disorderly, injurious, or vicious acts; be employed or seek employment; refrain from using alcohol; and attend Alcoholics or Narcotics Anonymous meetings. Piper went to live with Bartunek at her residence in McCook, Nebraska, after his release from jail on May 22, 1997. An electronic monitoring system was installed at Bartunek's residence, and Piper's ankle bracelet was attached. In essence, Piper was placed on an in-house curfew, and the electronic monitoring system was intended to help enforce the terms of the curfew.

Piper did not fully comply with the terms of his ISP. Initially, Piper failed to comply with Snowardt's requirement that Piper produce copies of 40 completed job applications per week. Piper did not regularly attend Alcoholics or Narcotics Anonymous meetings, and there was evidence suggesting that when Piper was released from the in-house curfew to seek employment, Piper did not go where he was supposed to go. However, Piper did obtain employment and passed the alcohol and drug tests that were administered. Snowardt did not seek to have Piper's ISP revoked.

In June 1997, Bartunek took her children and went to spend the weekend with her father in Trenton, Nebraska. Bartunek observed that one of her sons was bruised around the buttocks and lower back, and Piper had previously told Bartunek that he had spanked the child. Bartunek decided to break off her relationship with Piper, based on that incident and other instances in which Piper had been physically aggressive with Bartunek, particularly in demanding that Bartunek have sex with him. Later, Bartunek reported the spanking incident to the McCook Police Department; a citation was issued for child abuse, but the county attorney did not prosecute the matter.

On June 16, 1997, Bartunek and her father asked Piper to move out of her residence. Piper called Snowardt, who came to Bartunek's residence that evening and told Bartunek that it would be better if Piper moved the following day, because of the difficulty of moving the electronic monitoring equipment that

had been installed at Bartunek's residence. Bartunek and the children went to stay with Bartunek's father, but Snowardt ultimately managed to move Piper from the residence that evening.

Bartunek later reported to Snowardt that after Piper left the residence, her rent money was missing. Snowardt did not pursue the matter and, at trial, did not recall the incident. Nor did Snowardt report the allegation of child abuse to the district court. Piper continued to contact and harass Bartunek. Snowardt told Piper to stop contacting Bartunek. Piper did not comply, and for a time, Snowardt did not pursue the matter. After Bartunek's father reported that Piper had left a note on Bartunek's car, on July 21, 1997, Snowardt again told Piper to stop harassing Bartunek. Snowardt did not notify the court. On July 25, Piper confronted Bartunek outside her children's daycare center and threatened Bartunek because Piper's note had been given to Snowardt. Snowardt again told Piper to stay away from Bartunek and again failed to notify the court.

On August 15, 1997, Piper came to Bartunek's house and demanded a ride to a local store. Bartunek complied and testified that Piper had been drinking. That evening, Piper missed his in-house curfew. Snowardt was notified and telephoned Bartunek's father and Bartunek. Snowardt also notified the McCook Police Department and directed them to detain Piper. An officer of the McCook Police Department was dispatched to Bartunek's residence. The officer helped Bartunek secure the premises and searched the premises, finding nothing.

Close to midnight, Bartunek heard a noise in the basement and called police; officers were dispatched. Moments later, Piper came into the bedroom, naked except for his socks, and displayed a carving knife that he had taken from Bartunek's kitchen. Piper and Bartunek fought, and Piper attempted to rape Bartunek. Two officers of the McCook Police Department then arrived, broke into the house after they heard screaming, and subdued and arrested Piper. Piper was charged with and convicted of burglary, attempted first degree sexual assault, use of a deadly weapon to commit a felony, second degree assault, being a felon in possession of a deadly weapon, and resisting arrest.

After compliance with the presentment requirements of the State Tort Claims Act, Bartunek filed an action in the district

court seeking damages for the alleged negligence of the State in its supervision of Piper. Specifically, Bartunek alleged that her injuries from the sexual assault were proximately caused by the State's failure to revoke Piper's ISP when Piper failed to comply with its terms, and its failure to protect Bartunek from Piper's threats, particularly after Piper missed his in-house curfew. The State denied Bartunek's allegations and affirmatively alleged the defenses of sovereign immunity for a discretionary function, judicial or quasi-judicial immunity, contributory negligence, assumption of the risk, and failure to mitigate damages.

After trial, the district court made factual findings generally consistent with the facts recited above. The court found that Bartunek suffers from posttraumatic stress disorder as a result of the attack. The court found that Snowardt was negligent in his supervision of Piper and in his failure to protect Bartunek from Piper, primarily based on Snowardt's failure to seek revocation of Piper's ISP after Piper's repeated violations of its terms. The court rejected the State's affirmative defenses and entered judgment for Bartunek in the amount of $300,000.

## ASSIGNMENTS OF ERROR

The State assigns, as consolidated, that the district court erred in finding that (1) the State was not entitled to sovereign immunity based upon derivative judicial immunity, (2) Snowardt was negligent in his supervision of Piper, (3) the State owed a duty to Bartunek, (4) the State failed to meet its burden of proof as to the affirmative defenses of contributory negligence and assumption of the risk, and (5) Bartunek suffered $300,000 in damages.

## STANDARD OF REVIEW

In an appeal from a judgment rendered in an action brought under the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1996), the factual findings of the trial court will not be disturbed unless clearly wrong. See *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000). However, whether the allegations made by a plaintiff constitute a cause of action under the State Tort Claims Act is a question of law, on which an appellate court has a duty to reach its conclusions independent of the conclusions reached

by the district court. See *Blitzkie v. State*, 241 Neb. 759, 491 N.W.2d 42 (1992). Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003).

## ANALYSIS

█ The first and only issue that is necessary for us to address is whether a special relationship existed which gave rise to a specific duty on the part of the State to protect Bartunek from Piper. In order to recover in a negligence action brought pursuant to the State Tort Claims Act, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. *Id.* The threshold question is whether Bartunek has proved the existence of facts sufficient to establish that the State's probation officer owed a special duty to protect Bartunek from harm caused by Piper's criminal conduct. See *Hamilton v. City of Omaha*, 243 Neb. 253, 498 N.W.2d 555 (1993).

█ Law enforcement officials, including supervising probation officers and, consequently, state and local governments, generally may not be held liable for failure to protect individual citizens from harm caused by criminal conduct. See *id.* However, we have adopted Restatement (Second) of Torts § 315 at 122 (1965), which provides:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

See, *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998); *Hamilton, supra.* Comment *c.* to § 315 of the Restatement further provides that the relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316 through 319. See *Popple, supra.* Bartunek relies on both § 315(a) and (b).

SPECIAL RELATIONSHIP BETWEEN PROBATION
OFFICER AND VICTIM—§ 315(b)

■ Section 315(b) has been considered and applied by this court. We have stated that

> [L]iability is established if police have specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking. *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983). Such a duty to provide police services arises when there is some form of privity—a "special relationship"—between the police department and the victim that sets the victim apart from the general public and there are explicit assurances of protection that give rise to reliance on the part of the victim.
>
> We recognize that there are situations that provide exceptions to the no-duty rule: (1) where individuals who have aided law enforcement as informers or witnesses are to be protected or (2) where the police have expressly promised to protect specific individuals from precise harm. These two situations were discussed at length in *Morgan*. The court in *Morgan* recognized that a special relationship undoubtedly exists where an individual assists law enforcement officials in the performance of their duties.

*Brandon v. County of Richardson*, 252 Neb. 839, 843-44, 566 N.W.2d 776, 780 (1997). Accord *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001).

> "[A] special relationship does not come into being simply because an individual requests assistance from the police. . . . Otherwise, a police officer's general duty to the public inevitably would narrow to a special duty to protect each and every person who files a complaint with the department and attaches a request for help. . . .
>
> "Nor is the situation changed when the police gratuitously promise to provide protection. . . . A promise to act adds nothing to the obligation law enforcement officers have already assumed as members of a police force guided exclusively by the public interest. . . .
>
> "Between these boundaries are circumstances where the police do not benefit from a citizen's aid but nevertheless affirmatively act to protect a specific individual or a specific

group of individuals from harm, in such a way as to engender particularized and justifiable reliance."

*Hamilton v. City of Omaha*, 243 Neb. 253, 260, 498 N.W.2d 555, 560-61 (1993), quoting *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983). The same principles generally apply to supervising probation officers.

Furthermore, more than general reliance is needed to require the probation officer or police officer to act on behalf of a particular individual. The plaintiff must specifically act or refrain from acting in such a way as to exhibit particular reliance upon the actions of the probation officer or police officer in providing personal protection. Liability may be established, therefore, if the probation officer or police have specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking. See *Hamilton, supra*. Accord *Sweeney v. City of Gering*, 8 Neb. App. 675, 601 N.W.2d 238 (1999).

Plainly, the exception identified in *Brandon* for witnesses and informants is inapplicable in the instant case, and Bartunek does not argue that it is. Similarly, as in *Hamilton, supra*, the record does not reveal that any specific assurances made by Snowardt were relied upon by Bartunek.

Bartunek offered no evidence to suggest that Snowardt made any assurances to her that affected her behavior prior to the assault. The record does show that on the evening before the assault, Snowardt assured Bartunek's father that there was no need for him to go to Bartunek's home because Snowardt would notify the McCook Police Department that Piper had missed his curfew. However, the record also shows that in that instance, Snowardt did exactly as he had promised, because he instructed the police to locate and arrest Piper and to go check on Bartunek. The police went to Bartunek's residence, searched the house, and helped Bartunek secure the premises. Moreover, even if Bartunek's father relied on Snowardt's assurance, this falls short of showing that Bartunek herself, as the plaintiff, relied on Snowardt's assurances.

In short, there was no evidence that Bartunek acted or refrained from acting in such a way as to exhibit particular reliance on the actions of Snowardt. See, *Hamilton, supra*; *Sweeney, supra*. Without such evidence, Bartunek showed no

special relationship between herself and the State that gave rise to a tort duty.

## MEANING OF "TAKES CHARGE OF THIRD PERSON"—§§ 315(a) AND 319

█ This court has not previously analyzed Restatement (Second) of Torts § 315(a) (1965), the parameters of which are further defined by *id.*, § 319 at 129, providing that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." However, the illustrations to this section make plain that the phrase "takes charge" is intended to refer to a custodial relationship. The two illustrations provided are (1) the escape of a delirious smallpox patient from a hospital, resulting in further infections, and (2) the escape of a "homicidal maniac" from an asylum. See *id.* at 130.

Courts are divided on whether a parole or supervising probation officer generally has a duty under § 319 to control the behavior of a parolee or probationer. However, the majority of courts have concluded that the level of control afforded to a parole or probation officer is not such that an officer assigned to supervise a parolee or probationer "takes charge of a third person" within the meaning of the Restatement. See, e.g., *Kim v. Multnomah County*, 328 Or. 140, 970 P.2d 631 (1998); *Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677 (1998); *Fitzpatrick v. State*, 439 N.W.2d 663 (Iowa 1989); *Fox v. Custis*, 236 Va. 69, 372 S.E.2d 373 (1988); *Small v. McKennan Hosp.*, 403 N.W.2d 410 (S.D. 1987); *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985); *Humphries v. N.C. Dept. of Correction*, 124 N.C. App. 545, 479 S.E.2d 27 (1996). Cf. *Seibel v. City and County*, 61 Haw. 253, 602 P.2d 532 (1979). But see, *Bishop v. Miche*, 137 Wash. 2d 518, 973 P.2d 465 (1999); *A.L. v. Commonwealth*, 402 Mass. 234, 521 N.E.2d 1017 (1988); *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986), *supersession by statute recognized, Harris v. State, Dept. of Health*, 123 Idaho 295, 847 P.2d 1156 (1992); *Division of Corrections v. Neakok*, 721 P.2d 1121 (Alaska 1986). The Supreme Court of Oregon explained:

As evidence that a probation officer exercises a degree of control over a probationer such that the officer effectively "takes charge" of the probationer, plaintiffs point to the fact that a probation officer can, among other things, impose sanctions on a probationer, search his home or his person without a warrant, and cause warrants to be issued for the probationer's arrest if the probationer violates a condition of his probation. Although the existence of those powers demonstrates that probation officers have the ability to compel a probationer's compliance with the conditions of his probation, they do not permit the inference that a probation officer can control a probationer's conduct in such a way as to prevent him from harming others. By contrast, in a custodial relationship, a custodian is responsible for controlling the person's activities and is required to, and actually has the legal ability to, take precautions to prevent the person from doing harm.

*Kim*, 328 Or. at 147 n.3, 970 P.2d at 635 n.3. We agree with the foregoing rationale.

Like a custodial relationship, the relationship between a supervising probation officer and a probationer is continuing in the sense that it normally exists for an extended period of time. However, unlike a prisoner, a probationer is generally free to conduct his or her day-to-day affairs and is responsible only for reporting certain activities to the probation officer as they occur. See, *Fox, supra*; *Small, supra*; *Lamb, supra*. Unlike a jailer, a probation officer is not responsible for visually supervising a probationer on a 24-hour-per-day basis. Absent the legal responsibility of custodial or round-the-clock visual supervision, there is no logical basis for imposing an ongoing duty on a probation officer to prevent illegal conduct by a probationer.

We agree with the majority of courts to have decided this issue and likewise hold that in the absence of additional circumstances, a supervising probation officer does not "take charge" of a probationer to the degree necessary to create a duty to control every aspect of a probationer's conduct so as to prevent bodily harm to others. The fact that the probation in this case was "intensive supervision probation" does not except it from the general rule.

ISP imposes additional parameters on a probationer's activities and, most significantly, employs technological advances to provide the probation officer with the ability to enforce more stringent and detailed terms of probation. However, ISP does not change the essential nature of the relationship between the probation officer and probationer. With the exception of the in-house curfew imposed in this case, Piper was permitted to go about his day-to-day affairs without supervision, constrained only by the requirement that he seek permission in advance to leave home and explain for what reasons he would be out. While the ISP monitoring equipment provided notice if Piper missed his curfew, it did not permit the State to generally monitor his movements or to locate him in the event that curfew was missed. Piper was required to be at home unless permitted to leave, and Snowardt was informed if he was not, but once out of his home, Piper was able to conduct his affairs unmonitored by the State. On the facts of this case, the more rigorous requirements of ISP did not transform the relationship between Piper and the State into a custodial relationship within the meaning of accepted rules of tort law articulated in Restatement (Second) of Torts §§ 315(a) and 319 (1965).

The district court erred in concluding that the State was liable for failing to protect Bartunek from Piper's criminal conduct. There was no special relationship between Snowardt and Bartunek, or between Snowardt and Piper, that gave rise to a legal duty for Snowardt to control Piper's behavior and prevent him from harming Bartunek. Absent such a duty, Bartunek has failed to prove a cause of action for negligence on the part of the State. Because this conclusion is dispositive, we need not consider issues relating to breach, causation, or damages, nor is it necessary to consider the State's other assignments of error.

## CONCLUSION

The district court erred in concluding that the State had a particular duty to protect Bartunek from Piper's criminal acts. Bartunek failed to show the special relationship between herself and Snowardt, or between Snowardt and Piper, necessary for such a duty to arise. Consequently, Bartunek failed to prove an essential element of her cause of action, and the district court

erred in not dismissing her petition. The judgment of the district court is reversed, and the cause is remanded with directions to dismiss Bartunek's petition.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

HENDRY, C.J., not participating.