Adonnis HILL, As Father and Next Friend for Donnisha Hill (Deceased Minor) and Leneaka Johnson, As Mother and Next Friend for Donnisha Hill (Deceased Minor), and the Estate of Donnisha Hill, by and through Adonnis Hill and/or Leneaka Johnson, Administrators, Plaintiffs–Appellants,

v.

David A. DAMM, Bruce Edward Burt, and First Student, Inc., Defendants–Appellees.

No. 10–1565.

Court of Appeals of Iowa.

July 13, 2011.

Richard A. Pundt of Pundt Law Office, Cedar Rapids, and Larry J. Thorson of Ackley, Kopecky & Kingery, L.L.P., Cedar Rapids, for appellants.

Thomas B. Read and Carol J. Kirkley of Crawford, Sullivan, Read & Roemerman, P.C., Cedar Rapids, for appellee First Student, Inc.

Bruce Burt, Menard, Illinois, pro se.

David Damm, Pontiac, Illinois, pro se.

Heard by SACKETT, C.J., and DOYLE and DANILSON, JJ.

DOYLE, J.

A young girl was murdered after she got off at the wrong school bus stop. Her parents brought a negligence action against the bus company. At the close of the plaintiffs' evidence, the district court directed a verdict in favor of the bus company. The plaintiffs appeal, claiming the court erred in finding the harm suffered by the deceased was outside the scope of the risk of the bus company's conduct. This question requires us to consider the newly formulated risk standard under the Restatement (Third) of Torts, adopted by the Iowa Supreme Court in *Thompson v. Kaczinski*, 774 N.W.2d 829, 839 (Iowa 2009).

## I. Background Facts and Proceedings.

Thirteen-year-old Donnisha Hill was murdered on October 27, 2006. Donnisha lived on Lewis Street in Waterloo, Iowa, with her mother, Leneaka Johnson. Sixty-year-old David Damm lived across the street and owned a used car dealership several blocks away.

On October 11, Donnisha told her mother she was going to a friend's house to play. After Donnisha left, her friend called looking for her. Leneaka called Donnisha's father, Addonis Hill, and asked him to help look for Donnisha. Addonis drove around the neighborhood and saw Donnisha getting out of Damm's van. Addonis picked her up and took her home. Her parents questioned her about where she had been. Donnisha eventually told them she had been involved in a sexual relationship with Damm since September.

Donnisha's parents called the police and kept Donnisha out of school for two weeks. They considered sending her to live with family in Cedar Falls, but decided to keep her at home instead. On October 17, Donnisha snuck out of her house and met Damm at his dealership. When Addonis found her, she was not wearing any undergarments. The police were called again. Donnisha told an officer she had a crush on Damm and was upset she could not see him anymore. She later said she was scared Damm might hurt her.

On October 23, Donnisha's mother called First Student, Inc., the bus company that provided school bus services for Donnisha's school. She asked to have Donnisha's bus route changed to one closer to home. Her old route dropped her off near Damm's dealership, at the intersection of Linden and Glenwood. Leneaka was told to contact the school. She did that day and left a message for Cora Turner, the school district's executive director of students. The message stated, "Daughter was sexually abused by a neighbor and wants location closer to home so Mom can see her."

Turner called the police and verified that Damm was being investigated for sexually assaulting Donnisha. She according-

ly approved Leneaka's request and called First Student to tell them to change Donnisha's school bus route. She spoke to both a dispatcher and a bus driver. First Student changed Donnisha's bus to one that would drop her off near her house where Leneaka could see her—at the intersection of Willow and Lewis.

Leneaka sent Donnisha back to school on October 27. That afternoon, after school let out for the day, Leneaka watched for Donnisha from the window of her house. When Donnisha did not arrive, Leneaka called the driver of Donnisha's new school bus, Bessie Johnson, and asked if Donnisha was on the bus. Johnson said she was not. Johnson then called Rosemarie Stuart, the driver of Donnisha's old bus, looking for her. Stuart called out Donnisha's name, and students on the bus replied she was there. The conversation, as recorded by a video camera on the bus, continued:

JOHNSON: Okay. She's supposed to be on [bus] 35. So you gonna drop her off; right?

STUART: Okay. Where am I supposed to drop her off?

JOHNSON: Willow and Lewis.

DONNISHA: No, no; right here. I can walk back. I live like right down there. I can walk back.

STUART: On Willow and Lewis.

DONNISHA: Yeah, right down there.

STUART: She says she can walk back. I'm over here at Linden and Glenwood.

JOHNSON: No, she's supposed to be dropped off on Willow and Lewis.

STUART: No, I gotta take you over there.

DONNISHA: No. . . .

STUART: Okay, ten four. I gotta take you over there.

DONNISHA: No, let me off right here. I live right here.

STUDENT BEHIND HER: Can you let us off?

STUART: . . . [s]he's insisting that she get off. So what am I supposed to do?

STUDENT BEHIND HER: Let me off.

. . . .

STUART: Yeah. She's insisting that she gets off at the stop where I'm at and she says she'll walk back. So what am I supposed to do?

JOHNSON: Willow and Lewis.

. . . .

STUDENTS: She's going to get off when we get off of the—she's going to get off.

STUART: 34 to base. I've got another child that is supposed to be on 35 and she does not want to listen to get off at that stop. She says she's going to get off as soon as I open the door.

DISPATCHER: Well, then I guess if she's going to do that, then she's going to have a referral wrote and I will call Logan and she'll be suspended.

. . . .

JOHNSON: That man's gonna kill her.

Donnisha got off the school bus at the stop near Damm's dealership. Damm picked her up and took her to meet his friend, Bruce Burt. Donnisha thought Burt was going to take her to Chicago where Damm would meet her later. Instead, Damm had hired Burt to kill Donnisha. Her body was found in Galena, Illinois, several days later. Damm and Burt were subsequently convicted of Donnisha's murder.

Donnisha's parents, Leneaka and Addonis, brought suit against First Student,

as well as Damm and Burt. The plaintiffs alleged First Student was negligent in allowing Donnisha to get off at the wrong bus stop, which resulted in her contact with Damm and eventual death. The case proceeded to a jury trial. At the close of the plaintiffs' case, First Student moved for a directed verdict. It argued the plaintiffs did not present evidence showing Donnisha's murder was among the risks that made the bus company's conduct tortious. The district court agreed, ruling:

> First Student's duty was to take precautions only against further sexual abuse of Donnisha Hill by David Damm. . . . Donnisha Hill's murder by Bruce Burt was not the type of danger that naturally arose from her sexual abuse or that arises from sexual abuse of a person who is 12 or 13 years of age generally.
>
> . . . .
>
> . . . [T]he court disagrees with Plaintiffs' position that First Student's duty was to take precautions against any and all possible harm to Donnisha Hill that could have happened through contact with David Damm.

The plaintiffs appeal.[1]

## II. Scope and Standards of Review.

We review a trial court's grant of a motion for directed verdict for correction of errors at law. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 849 (Iowa 2010).

> In reviewing the grant of a motion for directed verdict, the court must determine whether reasonable minds could differ on the issue presented; if so, the grant was inappropriate. We view the facts in a light most favorable to the nonmoving party.

*Id.* (citations omitted). District courts are encouraged to deny motions for directed verdict, even if it seems clear the movant is entitled to judgment as a matter of law. *See State v. Keding*, 553 N.W.2d 305, 308 (Iowa 1996); *Reed v. Chrysler Corp.*, 494 N.W.2d 224, 229 (Iowa 1992), *overruled on other grounds by Jahn v. Hyundai Motor Co.*, 773 N.W.2d 550 (Iowa 2009). It is considered more prudent for the court to submit even a weak case to the jury to avoid another trial in case of error. *Keding*, 553 N.W.2d at 308. The jury should be given the opportunity to " 'consider the evidence, return a verdict, and potentially reach the same conclusion the court tentatively had reached.' " *Reed*, 494 N.W.2d at 229 (citation omitted). "[M]uch is wasted by granting directed verdicts in routine cases, or in cases that are at all close." *Id.; see also Royal Indem.*, 786 N.W.2d at 845("Even the weakest cases may gain strength during the defendant's presenta-

---

1. After the district court granted First Student's motion for directed verdict, the plaintiffs informed the court that under Iowa Rule of Civil Procedure 1.211,

   the court may not enter a judgment against either David Damm or Bruce Burt in this matter because both of them are confined in a penitentiary. So it is fruitless for us to proceed with this case in any respect because of the cases I've cited in this rule, so we would plead with the court to reverse its ruling based upon what we have just presented to the court.

   In its written ruling granting the directed verdict, the court stated, "On Plaintiffs' oral motion, made after the court announced its ruling on First Student, Inc.'s motion for directed verdict, Plaintiffs' petition is dismissed as to David A. Damm and Bruce Edward Burt." The plaintiffs now complain of this dismissal on appeal. Because we are reversing the district court's dismissal of the case against First Student, we reverse its dismissal of Damm and Burt as well. However, we note rule 1.211 provides that "no judgment may be entered in a civil case against an incarcerated person without the appointment of a guardian ad litem." *Garcia v. Wibholm*, 461 N.W.2d 166, 170 (Iowa 1990).

tion of the case."). Unfortunately the district court did not submit the case to the jury here.

### III. Discussion.

■ In *Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009), our supreme court adopted the principles of the Restatement (Third) of Torts: Liability for Physical Harm. The drafters of the third Restatement changed some of the terms and tests used in the second Restatement but largely retained the concepts embodied in that work. *See Royal Indem.*, 786 N.W.2d at 849. Like before, but in a somewhat different formulation, a plaintiff must show the following in order to prove a defendant was negligent: (1) the existence of a duty; (2) failure to exercise reasonable care; (3) factual cause; (4) physical harm; and (5) harm within the scope of liability (previously called "proximate cause"). *See* Restatement (Third) of Torts: Liab. Physical Harm § 6 cmt. b, at 67–68 (2010) [hereinafter Restatement (Third)]; *cf. Thompson*, 774 N.W.2d at 834 ("An actionable claim of negligence requires 'the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages.' " (citations omitted)).

The first element is a question of law for the court to determine. Restatement (Third) § 6 cmt. b, at 67. The next four are factual questions to be determined by the fact finder. *Id.* at 68. We are primarily concerned with the final element in this case—scope of liability. But we begin by considering the third Restatement's definition of negligence because that concept often converges with scope of liability. *Brokaw v. Winfield–Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 392 (Iowa 2010) (citing Restatement (Third) § 19 cmt. c, at 216–17).

■ The third Restatement states a person

acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm.

Restatement (Third) § 3, at 29. One prominent type of negligence is dealt with in section 19, which states the "conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party." *Id.* § 19, at 215.

■ Comment c to section 19 explains that in

many situations, the defendant's conduct foreseeably brings about the misconduct of a third party, which results in an injury to the plaintiff. While the foreseeability of this misconduct raises an issue of the defendant's negligence, it also raises an issue of whether the plaintiff's harm is within the defendant's scope of liability. See Chapter 6. However, the issues of defendant negligence and scope of liability often tend to converge. If the third party's misconduct is among the risks making the defendant's conduct negligent, then ordinarily plaintiff's harm will be within the defendant's scope of liability.

*Id.* § 19 cmt. c, at 216. "This section imposes liability where the actions of the defendant 'increase the likelihood that the plaintiff will be injured on account of misconduct of a third party.' " *Brokaw*, 788 N.W.2d at 391 (quoting Restatement (Third) § 19 cmt. e, at 218). The converse is that an "actor is not liable for harm

when the tortious aspect of the actor's conduct was of a type that does not generally increase the risk of that harm." Restatement (Third) § 30, at 542.

The following are examples of situations where the defendant has created or increased the likelihood of injury by a third person:

> For example, the defendant's conduct may make available to the third party the instrument eventually used by the third party in inflicting harm; or that conduct may bring the plaintiff to a location where the plaintiff is exposed to third-party misconduct; or that conduct may bring the third party to a location that enables the third party to inflict harm on the plaintiff; or the defendant's business operations may create a physical environment where instances of misconduct are likely to take place; or the defendant's conduct may inadvertently give the third party a motive to act improperly.

*Id.* § 19 cmt. e, at 218.

Relying on the second and third examples listed above, the plaintiffs claim First Student acted negligently in allowing Donnisha to get off at the wrong school bus stop, which was near Damm's dealership, instead of at the stop by her home where her mother could have watched her alight from the bus. First Student responds, and the district court agreed, that Donnisha's murder was outside the scope of risk of its conduct because Donnisha was murdered, not sexually abused. This argument brings us to the scope-of-liability element, as explained in section 29 of the third Restatement.

■ That provision states, "An actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." *Id.* § 29, at 493. "This principle, referred to as the 'risk standard,' is intended to prevent the unjustified imposition of liability by 'confining liability's scope to the reasons for holding the actor liable in the first place.'" *Thompson,* 774 N.W.2d at 838 (quoting Restatement (Third) § 29 cmt. d, at 579–80 (Proposed Final Draft No. 1, 2005)). The term "scope of liability" is used to distinguish between "those harms that fall within this standard and, thus, for which the defendant is subject to liability and, on the other hand, those harms for which the defendant is not liable." Restatement (Third) § 29 cmt. d, at 496.

To apply this rule requires consideration, "at an appropriate level of generality," of the risks that made the actor's conduct tortious and whether the harm for which recovery is sought was a result of any of those risks. *Id.* Risk consists of "harm occurring with some probability." *Id.*

> The magnitude of the risk is the severity of the harm discounted by the probability that it will occur. For purposes of negligence, which requires foreseeability, risk is evaluated by reference to the foreseeable (if indefinite) probability of harm of a foreseeable severity.

*Id.; see also id.* cmt. j, at 505 (discussing connection between the risk standard and foreseeability test used in proximate cause determinations). When defendants, as here,

> move for a determination that the plaintiff's harm is beyond the scope of liability as a matter of law, courts must initially consider all of the range of harms risked by the defendant's conduct that the jury *could* find as the basis for determining that conduct tortious. Then, the court can compare the plaintiff's harm with the range of harms risked by the defendant to determine whether a reasonable jury might find the former among the latter.

*Id.* cmt. d, at 496 (emphasis added).

The question we must decide is: At what level of generality should the type of

harm in this case be described? The plaintiffs argue, "If the risk is understood to be physical harm to Donnisha ... then it is clear that everyone, including the bus company, was aware of the danger of physical harm to Donnisha." First Student counters that

> the identifiable risk at the time of the allegedly tortious conduct on the part of First Student was that David Damm would make contact with and sexually abuse Donnisha, *not* that he would hire a third party to kidnap Donnisha, take her across state lines, and have her murdered.

We think this is a question that should have been submitted to and decided by the jury.

> Comment i to section 29 provides:
> The risk standard is defined with respect to risks of harm, while the "type of harm" can be described at varying levels of generality....
>
> No rule can be provided about the appropriate level of generality or specificity to employ in characterizing the type of harm for purposes of this Section....
>
> In addition to the difficulty of determining the appropriate level of generality with which to describe the type of harm, courts also confront the problem that the risks that are encompassed within the actor's tortious conduct may not be readily apparent.... [T]he negligence standard is quite general in the risks that it addresses. Thus, greater uncertainty and difficulty occur in negligence cases in determining whether the harm that resulted arose from the risks that made the actor's conduct unreasonable.
>
> Many cases will pose straightforward or manageable determinations of whether the type of harm that occurred was one of those risked by the tortious con-

duct. Yet in others, there will be contending plausible characterizations that lead to different outcomes and require the drawing of an evaluative and somewhat arbitrary line. *Those cases are left to the community judgment and common sense provided by the jury.*

*Id.* § 29 cmt. i, at 504–05 (emphasis added).

This comment reflects the "fact-intensive nature of the scope-of-liability issue." *Id.* cmt. d, at 499; *see also Thompson,* 774 N.W.2d at 838.

> In each case, the inquiry requires assessment, *based on the particular circumstances of the case,* of the legally cognizable risks that existed and that made the actor's acts or omissions with regard to those risks tortious. In a negligence action, *prior incidents or other facts evidencing risks may make certain risks foreseeable that otherwise were not,* thereby changing the scope-of-liability analysis.

Restatement (Third) § 29 cmt. d, at 499 (emphasis added); *see also Thompson,* 774 N.W.2d at 836 ("Causation is a question for the jury, '*save in very exceptional cases* where the facts are so clear and undisputed, and the relation of cause and effect so apparent to every candid mind, that but one conclusion may be fairly drawn therefrom.'" (citation omitted) (emphasis in original)).

In finding the harm suffered by Donnisha was outside First Student's scope of risk, the district court relied on the following illustration from section 29 of the third Restatement:

> Richard, a hunter, finishes his day in the field and stops at a friend's house while walking home. His friend's nine-year-old daughter, Kim, greets Richard, who hands his loaded shotgun to her as he enters the house. Kim drops the shot-

gun, which lands on her toe, breaking it. Although Richard is negligent for giving Kim his shotgun, the risk that makes Richard negligent is that Kim might shoot someone with the gun, not that she would drop it and hurt herself (the gun was neither especially heavy nor unwieldy). Kim's broken toe is outside the scope of Richard's liability, even though Richard's tortious conduct was a factual cause of Kim's harm.

*Id.* cmt. d, illus. 3, at 496–97. But in relying on this illustration, the court failed to consider facts particular to this case evidencing risks making certain risks foreseeable that otherwise were not. *Id.* cmt. d, at 499.

The plaintiffs presented evidence that First Student was aware Donnisha's bus route was changed for her overall safety in general, not just to prevent further sexual abuse. *See Brokaw,* 788 N.W.2d at 392–393 ("The risk is sufficiently foreseeable to provide a basis for liability when 'the actor [has] sufficient knowledge of the immediate circumstances or the general character of the third party to foresee that party's misconduct.' " (quoting Restatement (Third) § 19 cmt. f, at 220)).

Donnisha's mother testified,

> I changed the bus route specifically to be able to see my daughter get on and off of her school bus safely so I didn't have to worry about her being out of eyesight from the bus to [home] in the morning and the afternoon.
>
> . . . .
>
> I wanted to make sure that, you know, she did not have any contact with David Damm and just, you know, just wanted to be able to see her from point A to point B as much as I could.

The school district's message from Leneaka regarding the bus route change reflected the same concern: "Daughter was sexually abused by a neighbor and wants location closer to home so Mom can see her."

A dispatcher for First Student testified,

> Donnisha's mom and I spoke—I don't know exactly how long but it was at some length—and she . . . told me that there were problems going on and wanted the stop changed and we needed to do something.

The dispatcher continued, testifying that she knew

> there was a serious situation going on and that she needed to be let off the bus somewhere other than her normal stop because there was something serious going on. We didn't—did not get into detail. I just knew from the conversation from Mom and from Cora Turner that something needed to change because there was some type of danger.

She recalled being informed that if Donnisha did get on the wrong bus, the police were to be called immediately.

The driver of Donnisha's new school bus route knew more specifics than the dispatcher because of a personal relationship with the family. She, in fact, foresaw Donnisha's murder as a possibility after Donnisha got off the bus stop near Damm's dealership, stating, "That man's gonna kill her." While the district court discounted that statement as simply a premonition, in reviewing a motion for directed verdict we must "view the facts in a light most favorable to the nonmoving party." *Royal Indem.,* 786 N.W.2d at 849. We also consider evidence that Donnisha expressed fear of Damm before her murder, telling a detective that "if she did not do what he said she would be scared of what he might do to her. . . . She thought he might hurt her."

Based on these facts, we believe reasonable minds could differ as to whether the

type of harm suffered by Donnisha was among the harms whose risks made First Student's conduct tortious. *See* Restatement (Third) § 29 cmt. q, at 511 (stating it is the function of the jury in such cases "to determine whether the harm is within the defendant's scope of liability"). The foregoing facts also distinguish this case from the gun illustration in comment d to section 29 because the risk that made First Student negligent was the general risk that Donnisha would come in contact with and be physically harmed by Damm.[2] We do not read the Restatement as requiring the splitting of hairs employed by the trial court here. However, these Restatement provisions seem as clear as mud to us and other courts. *See, e.g., United States v. Monzel,* 746 F.Supp.2d 76, 86 n. 16 (D.D.C. 2010) ("Despite the well-established reputation of the ALI, the Court has strong concerns about whether the second prong of its causation analysis, which addresses the scope of liability, is going to be any easier or clearer for judges, who must write appropriate instructions on causation, or for jurors, who must apply them.").

We must also consider the district court's determinations that the

> bus company's negligence, if any, was not a proximate cause of Donnisha Hill's death because it would not have been a substantial factor in bringing about her death.
>
> Finally ... First Student's negligence, if any, was not a proximate cause of Donnisha Hill's death because, after she safely alighted from the bus, the decision she made to go west and south to Eastside Motors to meet David Damm, instead of north and east to her

mother's home, was her own independent decision and cannot be attributed to any negligence on the part of First Student, Inc. *See Burton v. Des Moines Metropolitan Transit Auth.,* 530 N.W.2d 696, 702–03 (Iowa 1995).

Although characterized as proximate-cause determinations, we believe the court was referring to the factual-causation component of the plaintiffs' negligence claim.

Section 26 of the third Restatement provides, "Tortious conduct must be a factual cause of harm for liability to be imposed. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct." Restatement (Third) § 26, at 346. The comments elaborate that an "actor's tortious conduct need only be *a* factual cause of the other's harm." *Id.* cmt. c, at 347.

> The existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur. Those other causes may be innocent or tortious, known or unknown, influenced by the tortious conduct or independent of it, but so long as the harm would not have occurred absent the tortious conduct, the tortious conduct is a factual cause.

*Id.* The "substantial factor" test as the routine test for factual cause is no longer used by the new Restatement. *See id.* cmt. j, at 353 (stating the substantial-factor test has not "withstood the test of time, as it has proved confusing and been misused"); *see also id.* § 29 cmt. a, at 493 ("Because the rules in this Chapter address the grounds for limiting liability with greater precision than the substantial-fac-

---

**2.** Here, Damm's actions facilitated Donnisha's murder. If Burt had murdered Donnisha independent of Damm, dropping Donnisha off at the wrong location would likely not be in First Student's scope of liability. Similarly, had Donnisha been attacked by some unforeseen angry dog, dropping Donnisha off at the wrong location would likely not be in First Student's scope of liability.

tor standard, this Restatement does not use that term.").

As to the second part of the court's ruling quoted above, we do not agree that Donnisha's decision to go to Damm's dealership unquestionably absolves First Student of liability. The plaintiffs presented evidence that First Student's decision to let Donnisha exit the school bus at a stop away from her home where her mother was watching for her brought her to a location where she was exposed to harm from Damm. *See id.* § 19 cmt. e, at 218. The fact that Donnisha acted to her own detriment in meeting Damm does not negate First Student's potential negligence. *See id.* cmt. b, at 216 ("In many situations, the foreseeable risk that renders the defendant's conduct negligent is the risk that potential victims will act in ways that unreasonably imperil their own safety."). Donnisha's mother testified that had Donnisha been dropped off at her new bus stop near her home, she could have seen her exit the school bus. Donnisha would have therefore been unable to meet with Damm as she was able to when dropped off near his dealership. *See id.* § 26 cmt. e, at 349 ("The requirement that the actor's tortious conduct be necessary for the harm to occur requires a counterfactual inquiry. One must ask what would have occurred if the actor had not engaged in the tortious conduct.").

Finally, we believe this case is distinguishable from the case relied on by the district court, which involved a commercial carrier as opposed to a school bus driver. *See Burton,* 530 N.W.2d at 697. "The general law among American jurisdictions holds that a carrier has an affirmative duty to discharge a passenger in a reasonably safe place." *Id.* at 699. Once the passenger safely alights, the relationship ends and the carrier's duty to the passenger resulting from the relationship ceases. *Id.*

Courts have accordingly been reluctant to hold common carriers liable for injuries to passengers caused after the passenger exits the vehicle. *Id.* The reasons for this rule are that "after alighting, the passenger's individual choice directs where he or she will walk," and "the passenger is in a better position to guard against the dangers of moving vehicles." *Id.*

■ By contrast, the "law has established some specific duties owed by a school bus driver to pupil/passengers." *Id.* at 700. When such a relationship exists, "the driver must use the care that 'an ordinarily prudent bus operator would exercise in looking after the safety of a child in his charge of the age of the pupil involved.'" *Id.* (citation omitted); *see also Johnson v. Svoboda,* 260 N.W.2d 530, 534 (Iowa 1977) ("[T]he relationship continues not only during the ride and until the pupil has alighted at the point of disembarkation but also, if the pupil must cross the road to the opposite side, until he has done so."). A full reading of *Burton* thus shows school bus drivers' duty to their passengers is greater than that owed by normal commercial carriers. *See Burton,* 530 N.W.2d at 700 ("The duties of a school bus driver are defined by the duties imposed by the law on school districts, not the duties imposed on common carriers. The law charges school districts with the care and control of children and requires the school district to exercise the same standard of care toward the children that a parent of ordinary prudence would observe in comparable circumstances." (citation omitted)).

### IV. Conclusion.

In the end, we believe this case should have been submitted to the jury because reasonable minds could differ on the issues presented when viewing the facts in a light most favorable to the nonmoving party. *See Royal Indem.,* 786 N.W.2d at 849. We

accordingly reverse the district court's grant of First Student's motion for directed verdict as to First District, as well as to Damm and Burt, and remand the case for a new trial.

**REVERSED AND REMANDED.**