# IN THE COURT OF APPEALS OF IOWA

No. 18-1473
Filed November 6, 2019

**RICHARD J. HOLMAN and BECKY S. HOLMAN, individually, as father and mother and next friend of C.L.H., a minor,**
    Plaintiffs-Appellants,

**vs.**

**DAC, INC.,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

The plaintiffs appeal the order granting summary judgment on their negligence claims in favor of the defendant. **AFFIRMED.**

Samuel A. Wooden, Todd K. Klapatauskas, and Natalia H. Blaskovich of Reynolds & Kenline, L.L.P., Dubuque, for appellants.

Thomas M. Boes, Jason C. Palmer, and Robert J. Thole of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.

Heard by Doyle, P.J., and Tabor and Schumacher, JJ.

**DOYLE, Presiding Judge.**

Did a group home providing caretaking services to an individual with intellectual disabilities owe a duty to protect third parties from the harmful acts of that resident? The district court determined it did not and granted summary judgment for the group home operator on negligence claims brought by the parents of a child who was injured by one of the home's residents.

The district court determined the group home operator, DAC, Inc. (DAC), did not owe a duty to third parties because it did not have a custodial relationship with its resident, Robert Robbins. In the alternative, and assuming the relationship was custodial, the court determined DAC did not owe a duty to third parties because Robbins's residence at DAC's Flora Home was for rehabilitative purposes only and not to protect the public at large. We agree with the district court and affirm its ruling.

## I. Background Facts and Proceedings.

DAC operates Flora Home, a group home in Dubuque that provides home and community based services (HCBS) under Medicaid's intellectual disability waiver program. Flora Home provides services to its residents based on individualized need as identified in each resident's individual care plan. *See* Iowa Admin. Code r. 441-78.41(1). These services must "be appropriate to the severity of the member's problems and to the member's specific needs or disabilities." *See id.* r. 441-78.27(4)(a)(6).

Robert Robbins is a person with an intellectual disability who moved into Flora Home on February 16, 2015. Robbins's behavioral history shows he engages in verbal aggression and has a history of physical aggression. Incidents

of sexual abuse are mentioned in his social history; one in which a caretaker sexually abused Robbins when he was a child and another in which Robbins sexually abused a child.

Robbins's individual care plan included several restrictions. It prohibited his access to medications, dangerous objects, and money. The plan also limited Robbins's alone time to eight hours in the community and four hours in the home. The plan also limited Robbins to showering up to one-half hour per day.

In the weeks after he moved into Flora Home, staff reported Robbins for inappropriate conduct many times. One week after moving in, Robbins tried to lure a staff member into a dark bathroom where he was showering, stating, "I have sexual tendencies with you." A few days later while alone in a room with a staff member, Robbins turned off the light, shut the door, and demanded that she "pull down [her] pants right now" before forcibly trying to remove her pants.

On March 4, Sarah Bourland, the DAC coordinator of Flora Home, wrote the following in an email to Neil Candee, Robbins's case manager at the Iowa Department of Human Services (DHS):

> I have gotten an incident report regarding [Robbins] closing the door after staff entered a room and [Robbins] asked them to take their pants [off] stating that he has sexual tendencies toward them. [Robbins] has been spoken to regarding this type of behavior and we will be looking at different activities in the community to help him with positive outlets.

On March 14, Robbins remarked about asking female staff into empty rooms or the garage. When a staff member told Robbins that this behavior "is not encouraged or tolerated," Robbins asked her, "If I were to attack you, would you call the police?" The staff member told Robbins that she would call the police

without hesitation if she felt threatened, to which Robbins laughed and said, "Yea[h] I won't mess with you!" Cathy Kelly, Robbins's direct care team leader, told Robbins the next day that "he cannot verbally threaten or physically threaten or assault staff in any form" and that this behavior "will not be tolerated." She forbade Robbins calling female staff downstairs and urged him to call a hotline when he felt "these urges" rather than act on them.

Bourland emailed Candee again on March 16, stating that Robbins "has been sexually harassing all of our female staff on a consistent basis." Bourland informed Candee that Robbins "has been lurking in the basement in the back storage room with the lights off trying to pull female staff in with him." Because of these behaviors, Bourland stated she "would be in favor of not giving him any alone time in the home as we do have a female consumer that may be left alone with him." Despite advocating for this restriction within the confines of Flora Home, Bourland expressed that she "would like to see [Robbins] have community time" to attend groups at the wellness center or participate in other activities, believing that "keeping [Robbins] busy will help with some of the behaviors and the isolating in his bedroom." She concluded the email by stating that "hopefully with the weather getting nicer there will be more choices for activities so that [Robbins] can enjoy his community and occupy his free time that he is using to harass staff."

On March 19, Bourland, Candee, and Kelly met to discuss "recent and continuous concerns" about Robbins. In response to his harassment of the staff, they decided to move Robbins to a different bedroom for the staff's safety. They also discussed incidents in which the staff could not locate Robbins in the home and discovered that he had left without informing a staff member. They decided

to limit Robbins's unsupervised time in the community to two hours per day. The next day, DAC changed Robbins's plan to prohibit unsupervised time in the home and reduce his unsupervised time in the community to two hours.

On March 25, with a staff member's approval, Robbins left Flora Home for community time. He returned two hours later. A short time later, Robbins left again without staff knowledge or permission. While missing from the home, Robbins approached C.L.H. as she walked home from school and told her he wanted to show her something and led her to a shed at the back of a property. He then grabbed C.L.H. by the front of her coat and warned her, "Don't tell anyone what I'm about to do." Robbins intended to have sexual intercourse with C.L.H., but she broke free and ran away. Robbins returned to Flora Home at 3:10 p.m. After receiving a report of the incident, police arrested Robbins.

Richard and Becky Holman, C.L.H.'s parents, petitioned against DAC. The Holmans alleged DAC was negligent in admitting, retaining, and supervising Robbins at Flora Home. They also all pled a fourth count of "general negligence," alleging DAC was negligent by: (1) allowing Robbins to leave Flora Home; (2) failing to monitor his activities, conduct, and whereabouts; (3) failing to take measures and safeguards to prevent Robbins from harming others; and (4) failing to warn others of any risks Robbins posed.

DAC moved for summary judgment on all four counts, arguing it did not owe C.L.H. a legal duty to protect her from Robbins. The district court agreed and granted summary judgment for DAC. The Holmans appeal.

**II. Scope and Standard of Review.**

We review a ruling granting summary judgment for the corrections of errors at law. *See* Iowa R. App. P. 6.907. In so doing, we view the evidence and every legitimate inference it will bear in the light most favorable to the nonmoving party. *See Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 545 (Iowa 2018).

Summary judgment is proper only if the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Iowa R. of Civ. P. 1.981(3). DAC, as the moving party, has the burden of showing the nonexistence of a genuine issue of material fact. *See Banwart*, 910 N.W.2d at 545. A fact is material if it might affect the outcome of the case. *See id.* "A genuine issue of fact exists if reasonable minds can differ on how an issue should be resolved." *Id.* Even if the facts are undisputed, summary judgment is improper if reasonable minds could draw different inferences from them to reach different conclusions. *See id.*

**III. Discussion.**

To succeed on a negligence claim, a party must show these elements: (1) existence of a duty, (2) a failure to exercise that duty, (3) factual cause, (4) physical harm, and (5) harm within the scope of liability (also known as proximate cause). *See Hill v. Damm*, 804 N.W.2d 95, 99 (Iowa Ct. App. 2011). Whether a duty exists is a legal question for the court to determine. *See id.* The remaining elements are fact questions for the jury to decide. *See id.*

The sole issue raised on summary judgment concerns the existence of a duty: did DAC owe a duty to protect C.L.H. from Robbins? The Holmans challenge

the district court's determination that DAC did not owe a legal duty to protect C.L.H. from Robbins.[1]

Historically, courts have looked at three factors in determining whether a duty to exercise reasonable care exists: "(1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (citation omitted). But in *Thompson*, our supreme court adopted the revised rule set forth in the Restatement (Third) of Torts, which removed the role of foreseeability of risk in assessing the existence of a duty. *Id.* Under this new rule, "[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7 (Am. Law. Inst. 2010).

The duty to exercise reasonable care does not extend to physical and emotional harm caused by third parties. *See* Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 37 (Am. Law. Inst. 2012) ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other."). But an exception exists when one is "in a special relationship with another." *Id.* § 41(a). In such cases, one "owes a duty of

---

[1] DAC notes the Holmans failed to include a statement in their brief addressing how they preserved error for appellate review, with references to the where in the record the issue was raised and decided, as required by Iowa Rule of Appellate Procedure 6.903(2)(g)(1). Failure to comply with the Iowa Rules of Appellate Procedure may lead to summary disposition of an appeal. *See Hanson v. Harveys Casino Hotel*, 652 N.W.2d 841, 842 (Iowa 2002). But it is clear the issue was raised and decided by the district court, and the scope of review is well settled. Because the omission does not hinder our review or consideration of the issue raised in this appeal, we will decide it on the merits. *See State v. Stoen*, 596 N.W.2d 504, 507 (Iowa 1999).

reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship." *Id.* § 41(a). The types of special relationships that create this duty include a parent's relationship to a dependent child, a custodian's relationship with those in its custody, an employer's relationship with employees when the harm results from the employment, and a mental-health professional's relationship with patients. *Id.* § 41(b).

Because no Iowa cases have addressed what makes a particular relationship custodial, the district court examined *Bartunek v. State*, 666 N.W.2d 435 (Neb. 2003) (cited in *Estate of Gottschalk v. Pomeroy Development, Inc.*, 893 N.W.2d 579, 593 (Iowa 2017) (Waterman, J., concurring specially)). There, a woman sued the State after a felon on probation assaulted her in her home, alleging the State was negligent in its supervision of the probationer. *Bartunek*, 666 N.W.2d at 437. The Nebraska Supreme Court held that no special relationship existed between a probation officer and probationer that would create a legal duty to control the probationer's behavior and prevent harm to others, even though the probationer was under intensive supervision probation (ISP). *Id.* at 442-43.

> With the exception of the in-house curfew imposed in this case, [the probationer] was permitted to go about his day-to-day affairs without supervision, constrained only by the requirement that he seek permission in advance to leave home and explain for what reasons he would be out. While the ISP monitoring equipment provided notice if [the probationer] missed his curfew, it did not permit the State to generally monitor his movements or to locate him in the event that curfew was missed. [The probationer] was required to be at home unless permitted to leave, and [his probation officer] was informed if he was not, but once out of his home, [the probationer] was able to conduct his affairs unmonitored by the State.

*Id.* at 443. "Absent the legal responsibility of custodial or round-the-clock visual supervision, there is no logical basis for imposing an ongoing duty on a probation officer to prevent illegal conduct by a probationer." *Id.* at 442.

Following the reasoning set forth in *Bartunek*, the district court determined the relationship between Robbins and DAC was not custodial. Although DAC placed restrictions on Robbins during his stay at Flora Home, his participation in the program was voluntary. Robbins was not committed or under court order to remain there. DAC did not have round-the-clock visual supervision of Robbins. DAC could not hold Robbins against his will or force him to follow its rules any more than the probation officer in *Bartunek* could force a probationer to observe curfew.

Even assuming a custodial relationship existed between DAC and Robbins, the district court found no special relationship could exist based on the purpose of the relationship. "Custodial relationships imposing a duty of care are limited to those relationships that exist, in significant part, for the protection of others from risks posed by the person in custody." Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 41 cmt. f (Am. Law. Inst. 2012). As the district court observed, "Nowhere in the regulations does it state that HCBS programs are required to maintain control or supervision of their consumers so as to protect the community from a risk of harm." Rather, HCBS providers afford "personal and home skills training services, individual advocacy services, community skills training services, personal environment support services, transportation, and treatment services." Iowa Admin. Code r. 441-78.41(1)(a). The district court found the relationship between DAC and Robbins was for rehabilitative purposes and

insufficient to create a duty. *See id.* ("A custodial relationship that exists solely for rehabilitative purposes is insufficient to create a duty to protect others. Thus, an inpatient clinic treating an individual with a compulsive-gambling addiction does not have a special relationship with the patient that imposes a duty of reasonable care to third parties.").

The Holmans dispute that the relationship between DAC and Robbins was for rehabilitative purposes. They argue that DAC was responsible for Robbins's "health and safety" and provided "protective oversight and supervision." Although HCBS providers deliver services related to health, safety, and protection, DAC provided such services for Robbins's benefit rather than the health, safety, or protection of the community.

We agree with the district court. The Holmans failed to show DAC had a duty to protect third parties from Robbins based on the relationship between them.

The district court also noted that our supreme court has articulated public policy reasons against holding psychiatrists liable based on decisions to release patients from involuntary commitment. *See Leonard v. State*, 491 N.W.2d 508, 512 (Iowa 1992) (finding that the disservice to the public caused by holding psychiatrists liable would far outweigh the risks posed by negligent release).

> Such a decision necessarily requires the psychiatrist to forecast the patient's likely behavior toward others upon release. We are convinced that if that prognosis were subject to second-guessing by any member of the public who might later be injured by the patient, it could severely chill the physician's capacity for decision making and ultimately threaten the integrity of our civil commitment system.

*Id.* The supreme court noted that the statutory framework mental health professionals operate in—requiring they "treat even seriously mentally impaired

persons in the least restrictive environment medically possible"—further weighs against finding psychiatrists liable. *Id.* The rationale applies equally to decisions by HCBS providers. *See* Iowa Admin. Code r. 441-78.41(16) (requiring all services under the intellectual disability waiver "be delivered in the least restrictive environment possible").

Because DAC had no legal duty to protect third parties from harm by Robbins, we affirm the order granting its motion for summary judgment.

**AFFIRMED.**