# IN THE SUPREME COURT OF IOWA

No. 12–0794

Filed June 21, 2013

LEEANN MITCHELL, Individually, and on Behalf of
D.E., her Minor Child,

Appellees,

vs.

CEDAR RAPIDS COMMUNITY SCHOOL DISTRICT,

Appellant.

---

Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.

Mother sued daughter's school district for damages daughter sustained in an after-hours, off-campus incident. A jury found the school district negligent. **AFFIRMED.**

David L. Baker, Cedar Rapids, and Terry J. Abernathy and Stephanie L. Hinz of Pickens, Barnes & Abernathy, Cedar Rapids, for appellant.

Brad J. Brady and Ann E. Brown-Graff of Brady & O'Shea, P.C., Cedar Rapids, for appellees.

**HECHT, Justice.**

The mother of a special education student sued the student's school district for damages the student sustained in an after-hours, off-campus sexual assault by another student. A jury found the school district negligent in failing to adequately supervise the special education student and awarded damages. We affirm the jury verdict.

### I.  Factual and Procedural Background.

In the fall of 2007, fourteen-year-old D.E. was a ninth-grade special education student at Cedar Rapids Community School District's Kennedy High School (Kennedy). D.E. has an IQ of 67 and was a Level II special education student at Kennedy that fall. As a special education student, D.E. had an Individualized Education Plan (IEP), which had been created by her mother and a team of education professionals at Kennedy. An IEP generally aims to make accommodations and provide support for students with disabilities. D.E.'s IEP revealed no special behavioral considerations and suggested she was capable of independently performing daily living skills except money management. D.E. was rarely, if ever, without direct adult supervision because of her diminished capacity, a fact established in the trial record but not expressly mentioned in her IEP.

Kennedy had two Level II special education teachers in the 2007–2008 school year—Sarah Biedenbach and Sandy Colberg. D.E. was Ms. Biedenbach's student in fifth period history and sixth period language arts classes that year. M.F., a nineteen-year-old twelfth-grade special education student, was Ms. Biedenbach's student in other classes that year.

Ms. Biedenbach had witnessed M.F. and D.E. spending time together that fall and had observed them engaging in physical contact

including kissing. Ms. Biedenbach assumed the relationship between M.F. and D.E. was age-appropriate and could not recall signs indicating the contact was against D.E.'s will. She also could not recall any history of M.F. having behavioral problems.

While Ms. Biedenbach testified she made it a habit to speak to her students about relationships when she observed them, she could not recall specifically whether she had spoken to M.F. and D.E. about theirs. Ms. Biedenbach indicated that in addition to her general concern that any of her students in relationships might engage in sexual activity, she had specific concerns after witnessing M.F. and D.E. together at school that they were sexually active, were likely to be together if absent from class at the same time, and might engage in sex if left unsupervised.

On October 26, 2007, D.E. called her mother, LeeAnn Mitchell, from school and asked if she could ride the bus after school to her friend S.K.'s house. This was an unusual request as Mitchell or a grandparent usually drove D.E. to and from school and D.E. had never previously ridden the bus to S.K.'s house. D.E. and S.K. represented to Mitchell that S.K.'s mother would be home that afternoon. Mitchell gave permission and instructed that D.E. call when she arrived at S.K.'s home. The school day ended at 2:45 p.m. for D.E.; Mitchell expected she would receive D.E.'s call around 4 p.m. Although D.E. was not typically home alone without adult supervision, Mitchell did not attempt to confirm with S.K.'s mother the accuracy of D.E.'s representation that supervision would be provided that afternoon.

D.E. and S.K. decided to leave school on October 26 after their fifth period class and skip sixth period, despite not having permission to leave school during the school day. They left at approximately 1:45 p.m., just after the fifth period ended, and met up with M.F. shortly thereafter in

the school parking lot.[1] M.F. did not have a scheduled sixth period class and was on his way home at that time. M.F. lived with his grandparents about two and a half miles from Kennedy, and he intended to walk there that day as he did most days.

Kennedy had a computerized system in place for tracking students' attendance and absences. Typically, a teacher would document a student's absence on a computer in the classroom at the beginning of each class. If a student left school during the school day, and a parent had not called to authorize the early departure, the student's absence would be recorded as unexcused. In the evening of the same day, an automated messenger system would place a phone call to the parents of each student with an unexcused absence and reveal the periods missed by the student. As Kennedy relied on this automated system for recording and reporting absences, the school's policy did not require teachers to place personal calls alerting parents of their children's absences.

Although Kennedy's policy did not require it, Ms. Biedenbach and Ms. Colberg typically took additional measures upon discovering a student's absence. Recognizing potential safety concerns faced by her students if absent from school without authorization and unsupervised, Ms. Colberg would call a student's parent upon discovering the student had left the building early without an excuse. Ms. Biedenbach's response to an unauthorized absence of a student was slightly different. She would (1) ask other students in class if they knew the missing student's whereabouts, (2) contact the main office to determine if school

---

[1]The parties dispute whether this meeting was prearranged. Kennedy suggests D.E. may have arranged the meeting by giving M.F. a note before the fifth period began. Mitchell denies any such writing was exchanged.

personnel had additional information, (3) contact the teacher of the student's prior class, and (4) contact campus security providing notice if the student was missing without excuse or authorization. Both Ms. Biedenbach and Ms. Colberg typically took these steps not mandated by the Kennedy policy even if the student's IEP indicated no specific behavioral problems and required no specific responsive action in the event of an unexcused absence.

The absences of D.E. and S.K. from their sixth period classes were recorded in Kennedy's computer system that afternoon. The record does not reveal whether Kennedy personnel took any other action that day in response to D.E.'s absence. Ms. Biedenbach does not recall placing a call to the school's attendance office or inquiring of other students or school personnel that day about the circumstances of D.E.'s absence.

Mitchell's expert, Dr. Bainbridge, opined Kennedy should have taken—and other schools would have taken—additional steps to find D.E. and prevent her from leaving early that day, including: (1) having a paraprofessional monitor D.E. when she was not in the classroom, (2) providing electronic alarms at the nonmain exit doors deterring unauthorized student departures during passing periods, (3) locating security officers around the school's perimeter to question students leaving campus early during the school day, (4) notifying Mitchell immediately upon the discovery of D.E.'s unexcused absence, and (5) promptly alerting the police that D.E. had gone missing.

After they departed the Kennedy campus that afternoon, M.F., S.K., and D.E. set out toward M.F.'s grandparents' house. At some point along the street fronting Kennedy, they encountered J.I., a former Kennedy student, who was driving a car. They accepted J.I.'s offer of a ride to M.F.'s grandparents' house.

D.E. and M.F. stayed at his grandparents' home for approximately twenty minutes and then walked a few blocks to the home of M.F.'s friend, V.M., arriving there around 4:00 p.m. V.M. was a tenth-grade special education student at Kennedy that year. M.F. and D.E. asked V.M. if they could go inside, but V.M. demurred and instead suggested they could enter his garage. M.F. and D.E. entered the garage and remained for about twenty minutes. M.F. raped D.E. in the garage while V.M. watched from a window and shot at D.E. with a BB gun. M.F. and D.E. then left V.M.'s around 4:45 p.m. and walked toward S.K.'s house.

At around the time M.F. and D.E. had arrived at V.M.'s, Mitchell received a call from J.I., informing her that D.E. had left her backpack with him. J.I. failed to provide Mitchell any details of D.E.'s whereabouts or any other information. Mitchell, alarmed, drove to S.K.'s house, arriving there before M.F. and D.E. Having not found D.E. at S.K.'s house, Mitchell drove toward the Kennedy campus. By the time Mitchell reached Kennedy, she received a call from M.F. and D.E. revealing they had arrived at S.K.'s house. Mitchell drove back immediately to retrieve them, delivered M.F. to his home, and then took D.E. home.

D.E. did not tell Mitchell what had happened that afternoon until early May 2008. Upon learning the details from D.E., Mitchell took D.E. to the police department and filed a report. M.F. eventually pled guilty to sex abuse in the third degree for committing a "sex act" when "the other person is fourteen or fifteen and the person is four or more years older than the other person."

In November 2009, Mitchell sued Kennedy for negligence, individually and on D.E.'s behalf, alleging Kennedy had breached a duty of reasonable care in one or more of the following ways: (1) failing to adequately supervise D.E., (2) failing to timely notify Mitchell of D.E.'s

unauthorized absence from school, (3) failing to adequately monitor D.E.'s attendance at school, (4) failing to take appropriate and immediate action upon the discovery of D.E.'s absence from school, (5) failing to provide adequate security to prevent special education students from leaving the school campus without authorization, and (6) failing to maintain an adequate system of monitoring special education students during the school day.

A jury trial was held in November 2011. At the close of the evidence, Kennedy moved for directed verdict on all issues "based on the fact that the conduct complained of in this case by M.F. was beyond the scope of the Defendant's liability." After some discussion among the court and counsel about the court's proposed jury instructions, Kennedy objected to certain specifications of negligence submitted by the court to the jury. The jury returned a verdict for D.E., finding $500,000 in damages and apportioning seventy percent fault to Kennedy and thirty percent to D.E.

Following the verdict, Kennedy moved for judgment notwithstanding the verdict, or in the alternative a new trial, asserting (1) Kennedy did not owe D.E. a duty of care, (2) D.E.'s injuries were outside the scope of Kennedy's liability, and (3) Kennedy's failure to call the police could not have been a cause in fact of D.E.'s injuries and thus should not have been submitted to the jury as a specification of negligence.

The district court denied Kennedy's posttrial motion. The court's ruling concluded in pertinent part: (1) Kennedy failed to raise the duty issue in its motion for directed verdict and thereby waived error, (2) whether D.E.'s injuries were within Kennedy's scope of liability was an issue for the jury, and (3) Kennedy waived error—again by failing to raise

the matter in its motion for directed verdict—on its claim that any failure to call the police was not a factual cause of D.E.'s injuries.

## II.  Scope of Review.

The district court's ruling on Kennedy's motion for judgment notwithstanding the verdict that Kennedy waived error on its no-duty claim is reviewed for errors at law.  *See Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 859 (Iowa 2001).  We review rulings on motions for directed verdict for correction of errors at law.  Iowa R. App. P. 6.907; *Crookham v. Riley*, 584 N.W.2d 258, 265 (Iowa 1998).  In ruling on the posttrial motions, we view the evidence in the light most favorable to the nonmoving party.  *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010).

## III.  Discussion.

Kennedy raises three issues on appeal, contending: (1) a school district owes no duty to protect students from a third party outside the school day, off school grounds, and not during a school activity, (2) the trial court erred in denying Kennedy's motions for directed verdict and judgment notwithstanding the verdict because the harm caused was not within Kennedy's scope of liability as a matter of law, and (3) the trial court erred in including among the submitted specifications of negligence Kennedy's failure to call the police.

**A.  Preservation of the No-Duty Argument.**  The parties dispute whether Kennedy's duty argument was preserved below.  Mitchell contends Kennedy's motion for directed verdict, the jury instruction colloquy, and the district court's ruling on the motion failed to address the duty issue.  Instead, Mitchell asserts, duty was first raised in Kennedy's motion for judgment notwithstanding the verdict, and thus was not preserved for appellate review.  Kennedy responds that its

motion for directed verdict, while failing to use the word "duty," was sufficiently specific to put the district court on notice of the nature of its protest. Further, Kennedy contends, the jury instruction colloquy brought the court's attention to the issue of whether Kennedy owed D.E. a duty of care with regard to "risks that occurred while plaintiff was not at school or during school."

It is well-settled that a party fails to preserve error on new arguments or theories raised for the first time in a posttrial motion. *Field v. Palmer,* 592 N.W.2d 347, 351 (Iowa 1999). A motion for judgment notwithstanding the verdict must stand on grounds raised in the motion for directed verdict. *Id.* at 350. Accordingly, we look to the contents of Kennedy's motion for directed verdict in identifying the issues preserved for our review. *See Pavone v. Kirke*, 801 N.W.2d 477, 487 (Iowa 2011).

Although our error preservation rules are not designed to be hypertechnical*, Griffin Pipe Prods. Co. v. Bd. of Review*, 789 N.W.2d 769, 772 (Iowa 2010), we require that the nature of any alleged error be timely brought to the attention of the district court, *Summy v. City of Des Moines*, 708 N.W.2d 333, 338 (Iowa 2006). Further, claimed errors must be raised with some specificity in a directed verdict motion. *Id.* General averments in a motion for directed verdict will not typically maintain particular issues for the district court's further consideration in ruling on motions for judgment notwithstanding the verdict. *See Ragee v. Archbold Ladder Co.*, 471 N.W.2d 794, 797–98 (Iowa 1991).

Here, Kennedy's motion for directed verdict stated in its entirety:

> [T]he Defendant would move for a directed verdict on all the issues in this case based on the fact the conduct complained of in this case by [M.F.] was beyond the scope of the Defendant's liability. The evidence in this case has shown that this incident occurred off school grounds, after school hours, did not in any way, shape, or form involve an

employee of the Cedar Rapids Community School District; was certainly not the type of incident that could be reasonably foreseen as to logically follow from the fact that a student might skip school.

As a result, under the Restatement (Third) of Torts, the *Thompson v. Kaczinski* case, *Royal Indemnity* and *Hill v. Damm,* we believe the Defendant is entitled to a directed verdict in its favor. Thank you.

As noted, the district court denied the motion, finding substantial evidence supported each element of Mitchell's claim. Further, the court explained,

[R]easonable minds could differ on the outcome, and I don't believe that the scope of liability as defined by the cases cited by [Kennedy] and in the jury instructions and under the Restatement (Third) warrant or demand a directed verdict in this case.

After the jury returned its verdict for D.E., Kennedy moved for judgment notwithstanding the verdict on several grounds. Among them was the argument that "no duty exists because the harm did not occur at school, during school hours or at a school-sponsored event." The district court denied the motion, explaining the question whether Kennedy owed D.E. a duty of care was not raised in Kennedy's motion for directed verdict and could not, therefore, be considered at the posttrial stage.

We cannot conclude—from the nature of Kennedy's directed verdict motion or from the nature of the district court's ruling on the motion—that the no-duty argument advanced on appeal was adequately brought to the district court's attention. Kennedy moved generally for a directed verdict on "all issues" and then advanced only its scope-of-liability argument. The details offered in the motion's next sentence are fairly understood as facts supporting Kennedy's scope-of-liability argument, particularly given their position immediately following the mention of scope of liability. The motion's reference to foreseeability is not helpful to

Kennedy's preservation argument, as we have previously explained foreseeability may play a role in breach and scope-of-liability determinations, but it no longer has a place in duty determinations. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009).

We further conclude Kennedy's citation of *Thompson*, *Royal Indemnity*, and *Hill* in the motion for directed verdict cannot be said to have highlighted the duty issue for the district court. Neither *Royal Indemnity* nor *Hill* considered a no-duty claim. *See Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 849–52 (examining insurer's scope of liability); *Hill v. Damm*, 804 N.W.2d 95, 99–104 (Iowa Ct. App. 2011) (examining bus company's negligence, causal role, and scope of liability). In *Thompson*, we examined a duty determination, but in the process we established that we ordinarily recognize a general duty of reasonable care without consideration of foreseeability, absent exceptional circumstances. *See Thompson*, 774 N.W.2d at 834–35. Finding the defendant in that case owed a duty (after explaining that in most cases involving physical harm, courts " 'need not concern themselves with the existence or content of [the] ordinary duty' " to exercise reasonable care), we moved on to a discussion of scope of liability. *Id.* at 835, 839 (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 6 cmt. *f*, at 69 (2010) [hereinafter Restatement (Third)]). The record here reveals no discussion during the brief consideration of the motion for directed verdict of the relevance of *Thompson*, *Royal Indemnity*, or *Hill* to a subject other than scope of liability—perhaps because it did not appear that the existence of Kennedy's duty was in dispute. Indeed, the district court's ruling on the directed verdict motion suggested it properly understood Kennedy's

arguments on the facts and the law were advanced in support of its scope-of-liability argument.

In contending the directed verdict motion was not limited to the scope-of-liability issue, Kennedy relies heavily on a comment to the Restatement (Third) section addressing affirmative duties and describing a school's duty as "applicable to risks that occur while the student is at school or otherwise engaged in school activities."[2]  *See* Restatement (Third) § 40 cmt. *l*, at 45 (2012).  A court aware of this principle set forth in section 40, Kennedy contends, would fairly infer from the directed verdict motion's language "off school grounds, after school hours" that the motion was asserting the affirmative duty limitation noted in comment *l*.  Further, Kennedy asserts, the jury instruction colloquy between the parties and the district court directed the court's attention to comment *l* and adequately alerted the district court to the duty question now asserted on appeal.

We find Kennedy's preservation argument unpersuasive.  When Kennedy's counsel forwarded proposed jury instructions to the court and opposing counsel a few days before trial, he expressly conceded Kennedy

---

[2]Kennedy has also raised on appeal an argument that specific language from section 19 of the Restatement (Third) suggests the issues "of duty, foreseeability and scope of liability" may be intertwined in cases of affirmative duties like the one at issue here.  *But see* Restatement (Third) § 19 cmt. *c*, at 216 (explaining convergence of *breach* and scope of liability).  The record does not reveal, however, that this notion derived from section 19 was raised below, that the district court was ever made aware of the specific language of comment *c*, or that the court considered section 19 outside the context of the discussion of foreseeability and scope of liability.  We also find no evidence in the record that Kennedy alerted the district court to the argument it presses on appeal: that its argument directed expressly at the scope-of-liability issue was so intertwined with the issue of whether an affirmative duty was owed as to alert the district court to both issues.  The relationship between affirmative duty and scope-of-liability issues is explicitly referenced in comment *f* to the Restatement (Third) section on scope of liability, but we find no indication that the comment was brought to the district court's attention in this case.  *See* Restatement (Third) § 29 cmt. *f*, at 500–01.

had a duty of reasonable care.[3]  During the jury instruction colloquy at trial, he took the same position, explaining "[the school] must exercise the same standard of care towards [its students] that a parent of ordinary prudence would observe in comparable circumstances," and "[t]he school's duty includes the duty of reasonable care to the student with regard to risks that arise within the scope of the school–student relationship."  Kennedy's counsel's reference to comment *l* came later in the jury instruction colloquy, when he expressed concerns about the instructions' statement of the risks for which Kennedy might be liable. At that point, he suggested comment *l* was relevant to "the other instructions on, you know, the scope of liability."  Offering no indication that comment *l* might support a determination that Kennedy owed no duty in this case, counsel relied instead on the comment as support for its effort to persuade the district court that the scope of the instructions on foreseeability and reasonable care should be narrowed.  We are not persuaded on this record that the district court was adequately alerted to the duty issue raised by Kennedy on appeal.  *See Field*, 592 N.W.2d at 351–52 (expressing reservation that objection to a jury instruction could ever substitute for proper motion for directed verdict and explaining any objections must specify the objectionable matter and the grounds for objection).

Finally, while we strive to avoid hypertechnicality in our error preservation jurisprudence, we note the cases cited by Kennedy are unavailing.  We found an objection preserved error in *Griffin*, a case

---

[3]In his email forwarding the instructions to the court and opposing counsel, Kennedy's counsel explained "[a]s I now understand it, since the Supreme Court's decision in *Thompson* adopting Restatement Third, the focus is no longer on defining 'duty.'  Everyone has a duty of reasonable care and it is for the jury to determine whether that duty has been breached."

involving an objection to an increased tax assessment for a building, in large part because the objection raised all the information available to the appellant at the time. *Griffin Pipe Prods. Co.*, 789 N.W.2d at 772 (explaining tax assessor had never before used the word "building" to include machinery and equipment and preserving appellant's challenge to taxability of equipment). Only later in the administrative process did the basis for the challenged assessment, and thus, the specific ground for the appellant's objection, become clear. *Id.* Kennedy suffered no comparable information deficit curtailing its opportunity to assert a specific duty-based challenge in the motion for directed verdict in this case.

Our ruling in *Summy* is no more helpful to Kennedy on this point. There, the appellee had orally raised its specific objection to the impanelling of a jury before the jury was sworn, and thus had effectively alerted the district court to the alleged error at a time when corrective action could properly be taken. *See Summy*, 708 N.W.2d at 338. Here, by contrast, the record reveals Kennedy failed to specifically raise the duty issue until the motion for judgment notwithstanding the verdict. Mitchell, not aware duty was in issue, never had an opportunity to be heard on the issue before the verdict, and neither Mitchell nor the district court had any opportunity to take corrective measures or pursue alternatives. *See Lee v. State*, 815 N.W.2d 731, 739 (Iowa 2012).

Accordingly, we conclude Kennedy failed to preserve its duty argument for appellate review.

**B. Scope of Liability.** Kennedy contends the harm to D.E. was outside Kennedy's scope of liability as a matter of law because (1) Kennedy's conduct could not fairly be said to have been a but-for

cause of the harm,[4] and (2) Kennedy's alleged failure to adequately supervise D.E. or report her unauthorized absence up the school's chain of command did not make it any more likely that the specific harm suffered by D.E. would occur. Mitchell counters that (1) Kennedy's apparent factual causation argument, framed as a scope-of-liability argument, was not adequately preserved for appellate review, and (2) the jury properly found the harm to D.E. was within Kennedy's scope of liability.

As a threshold matter, we are not persuaded that Kennedy's but-for factual causation argument was adequately raised below. The motion for directed verdict, as set forth above, presented a scope-of-liability argument based on several cited cases. Although the cited cases—*Hill* and *Royal Indemnity*—included some analysis of factual causation, Kennedy failed to urge a factual causation deficit in the plaintiff's case at the directed verdict stage or during the jury instruction colloquy.

The motion for directed verdict and the argument presented to the district court in support of it made no effort to explain how, if at all, the cited cases supported a directed verdict on factual causation grounds. We think it likely the district court inferred—from Kennedy's citation of the cases in proximity to the discussion of scope of liability and the lack

---

[4]The "but-for" test Kennedy raises is tort law's familiar *factual* causation test: "an act is a factual cause of an outcome if, in the absence of the act, the outcome would not have occurred." Restatement (Third) § 26 cmt. *b*, at 347. We have previously explained that factual cause and scope-of-liability determinations require separate inquiries. *See Thompson*, 774 N.W.2d at 836–38. The Restatement (Third) confirms that scope-of-liability and factual causation inquiries are distinct inquiries, and that the concept of scope of liability, previously referred to as proximate causation, is neither about proximity nor causation as those words are commonly understood. *See* Restatement (Third) § 26 Reporters' Note cmt. *a*, at 357. Accordingly, the Restatement (Third) treats factual causation and scope of liability as separate concepts in separate chapters. *Id.*

of any clarifying or alternative explanation of a connection to factual causation—that the authorities were cited in support for their relevance to the scope-of-liability argument. As explained above in our discussion of preservation of the duty issue, we think a fair reading of the motion for directed verdict, the record made in support of the motion, and the jury instruction colloquy consistently indicate Kennedy's focus was upon the scope of its liability. Kennedy cited *Thompson*, *Royal Indemnity*, and *Hill* in support of its scope-of-liability argument at both stages.[5] Accordingly, we conclude Kennedy did not preserve its factual causation argument below and we decline to address its merits here.

Turning to the remaining scope-of-liability inquiry, we have explained that tort law will not always impose liability on an actor for all harm factually caused by an actor's tortious conduct. *Thompson*, 774 N.W.2d at 837. Instead, an actor's liability is limited to the physical harms that result from the risks that make an actor's conduct tortious. *Id.* at 838; *see also Hoyt v. Gutterz Bowl & Lounge, LLC*, 829 N.W.2d 772, 780 (Iowa 2013). We employ the scope-of-liability analysis to avoid unjustified liability and to confine liability in a way consistent with the reasons for holding an actor liable in the first place. *See Hoyt*, 829 N.W.2d at 781. Scope-of-liability determinations are fact-intensive, requiring consideration of the risks that make an actor's conduct tortious and a determination of whether the harm at issue is a result of any of those risks. *See Thompson*, 774 N.W.2d at 838.

---

[5]The record reveals the school district made objections during the colloquy other than its scope-of-liability objections. Those objections, however, were directed to proposed negligence specifications and were made on the grounds of insufficient evidence and unnecessary repetition. The discussion on negligence specifications made no mention of or reference to factual causation.

Section 29 of the Restatement (Third) outlines the scope-of-liability analytical framework as follows:

> Central to the limitation on liability of this Section is the idea that an actor should be held liable only for harm that was among the potential harms—the risks—that made the actor's conduct tortious. . . .
>
> Thus, the jury should be told that, in deciding whether the plaintiff's harm is within the scope of liability, it should go back to the reasons for finding the defendant engaged in negligent or other tortious conduct. If the harms risked by that tortious conduct include the general sort of harm suffered by the plaintiff, the defendant is subject to liability for the plaintiff's harm. When defendants move for a determination that the plaintiff's harm is beyond the scope of liability as a matter of law, courts must initially consider all of the range of harms risked by the defendant's conduct that the jury *could* find as the basis for determining that conduct tortious. Then, the court can compare the plaintiff's harm with the range of harms risked by the defendant to determine whether a reasonable jury might find the former among the latter.

Restatement (Third) § 29 cmt. *d*, at 495–96. Tortious conduct may be wrongful because of various risks to various classes of persons, explains section 29, and while some risks may be more prominent than others, all are relevant in determining whether harm is within the appropriate scope of liability for the actor's conduct. *Id.* at 497. The context in which the actor's conduct is tortious is paramount, and an appropriate examination of the context includes the facts establishing the risks existing at the time of the conduct and the manner in which the conduct was deficient. *Id.* cmt. *h*, at 502. Prior incidents and other facts evidencing risks may make certain risks foreseeable that otherwise were not, thereby changing the scope analysis. *Id.* cmt. *d*, at 499.

Section 30, restating section 29 slightly, expands upon the limiting principle for scope-of-liability determinations, explaining that "[a]n actor is not liable for harm when the tortious aspect of the actor's conduct was

of a type that does not generally increase the risk of that harm." *See id.* § 30, at 542. The critical inquiry, section 30 suggests, is

> whether the risks posed by the tortious conduct of the actor would, if repeated, make it more likely that harm such as that suffered by the other person would also occur. If the harm is no more likely to occur than if the actor desisted from the tortious conduct, the harm is not within the scope of the actor's liability . . . .

*Id.* cmt. *a,* at 543. Section 40's description of Kennedy's affirmative duty provides an additional limiting principle for our analysis, explaining that the duty is only applicable to risks arising while a student is at school or otherwise engaged in school activities. *Id.* § 40 cmt. *l*, at 45.

Section 34 includes in the scope-of-liability inquiry intervening acts that may be a source of risks making an actor's conduct tortious. "In some instances," section 34 explains, "the risks posed by even an extraordinary force of nature or by a culpable . . . human act may be precisely the risks that render tortious an actor's failure to adopt adequate precautions." *See id.* § 34 cmt. *d,* at 572. Recognizing section 19 addresses the basis for finding negligence (i.e., that a party has satisfactorily demonstrated the element of breach) when there is a foreseeable risk of improper or criminal conduct by another, section 34 explains that "[w]hen an actor is found negligent precisely because of the failure to adopt adequate precaution against the risk of harm created by another's acts or omissions, there is no scope-of-liability limitation on the actor's liability." *Id.*

Here, the parties offer competing characterizations of the harm suffered by D.E. Kennedy suggests the harm for which recovery was sought was "M.F.'s having sex with D.E." while D.E. was truant. Mitchell, by contrast, suggests the harm was the rape of D.E.—a special education student functioning at a third-grade level, known to be particularly susceptible to persuasion, and under consistent

supervision—by an adult special education student whom D.E.'s teacher had witnessed being amorous with D.E. We have previously explained we cannot provide any bright-line rule to determine the appropriate level of generality or specificity to employ in characterizing the range of harms relevant to scope-of-liability determinations. *Hoyt*, 829 N.W.2d at 781. Instead, where contending plausible characterizations of the range of reasonably foreseeable harms arising from the defendant's conduct lead to different outcomes and require line-drawing, we have seen fit to leave the case to the judgment and common sense of the fact finder. *Id.*

On these facts, we conclude there was sufficient evidence to generate a jury question on the issue of whether the harm D.E. suffered was among the potential harms that made Kennedy's conduct tortious. The parties appear to agree that students in the age range of D.E. and M.F. will often engage in sexual activity and will go to some length to avoid supervision in pursuing it. Indeed, Kennedy's argument that D.E. orchestrated a plan to be alone with M.F. on the day in question appears to depend on the factual concession that she aimed to avoid supervision, which might have prevented the encounter. While Kennedy contends D.E.'s skipping her last class of the day made it—as a matter of law—no more likely she would have a sexual encounter with M.F. later that day than had she been supervised through the end of the school day, we are not persuaded on this record. D.E. was a Level II special education student functioning at approximately a third-grade level and was nearly always under adult supervision. The Level II special education teachers at Kennedy typically undertook substantial precautions upon discovering absences from class, including consulting other teachers, the front office, and often even the students' parents, in large part because of safety concerns about the students. Some evidence in the record tended to

prove D.E. was particularly trusting, perhaps excessively so, and may have often been unable to distinguish safe situations from unsafe situations. In addition, Ms. Biedenbach had observed M.F. and D.E. interact with physical intimacy on various occasions that fall.

Notwithstanding all these facts, Kennedy's response to D.E.'s absence from sixth period that day was apparently limited to Ms. Biedenbach's recording of the absence in Kennedy's automated computer system. That system provided Mitchell with a notification of D.E.'s absence sometime in the evening, several hours after the harm had occurred. We think the record was sufficient to engender a jury question as to whether the failure to supervise D.E. in any of the ways described in Mitchell's expert's testimony and in the submitted specifications of negligence increased the risk she would leave the campus unsupervised with M.F. and suffer the harm found by the jury in this case.[6]

Further, we reject Kennedy's argument that the location of the off-campus assault and the time of its occurrence after school hours are dispositive of the scope-of-liability issue as a matter of law. Section 40's limitation of Kennedy's affirmative duty of reasonable care to risks occurring "while the student is at school or otherwise engaged in school activities" is silent as to the appropriate scope of liability for risks *arising* at school but *materializing* at some later time. The duty and scope-of-

---

[6]We do not mean to suggest *every* intervening act and attendant harm, if foreseeable under a given set of circumstances, might fall within an actor's scope of liability if the harm is among the risks making the actor's conduct tortious. Instead we think questions regarding the foreseeability, culpability, and significance of an intervening act all bear on whether the harm is within the scope of liability. Consistent with the goals of the drafters of the Restatement (Third), however, we believe these determinations are typically best left to juries, as was the case here. *See* Restatement (Third) § 34 cmt. *e*, at 572–74.

liability inquiries are different inquiries. As we have already noted, Kennedy's duty-based challenge was not asserted in the motion for directed verdict and was not preserved for appeal.

We conclude the evidence was sufficient to support the jury's findings that Kennedy acted unreasonably and that its negligence increased the risk of D.E.'s harm. Those findings are consistent with the Restatement's scope-of-liability analytical framework and with the caselaw from jurisdictions that have found schools may be liable for injuries to students occurring after school hours and off school grounds. *See, e.g., Perna v. Conejo Valley Unified Sch. Dist.*, 192 Cal. Rptr. 10, 12 (Ct. App. 1983) (explaining school district may be held liable for injuries suffered by student off school premises and after school hours when those injuries are a result of school's negligence while student is on school premises); *Doe v. Escambia Cnty. Sch. Bd.*, 599 So. 2d 226, 228 (Fla. Dist. Ct. App. 1992) (reversing summary judgment for school board; finding fact question remained regarding whether school district had breached its duty to adequately supervise mentally disabled fourteen-year-old who left school grounds during lunch period with male and was later sexually assaulted in private home); *Gary v. Meche*, 626 So. 2d 901, 905 (La. Ct. App. 1993) (finding liability for after-hours, off-campus injury, holding school's duty to supervise children requires "a policy to insure that young children, such as [a six-year-old], do not leave the school unattended"); *Sutton v. Duplessis*, 584 So. 2d 362, 366 (La. Ct. App. 1991) (explaining school authorities should have foreseen that six-year-old student might disobey instructions not to leave office, and thus school board was liable for injuries sustained by student, who left school grounds after school, darted out into street and ran into side of automobile, where student had been waiting for his mother to pick him

up in office with secretary); *Jerkins v. Anderson*, 922 A.2d 1279, 1281 (N.J. 2007) (explaining school may be liable for postdismissal, off-campus injury and holding school's duty of reasonable supervision requires school to create reasonable dismissal policies to protect students as the school day ends).

We acknowledge that other jurisdictions, using the old duty framework of the Restatement (Second), have rejected the possibility of liability for injuries occurring after hours and off school grounds after concluding the injuries were unforeseeable. *See, e.g.*, *Kazanjian v. Sch. Bd.*, 967 So. 2d 259, 268 (Fla. Dist. Ct. App. 2007) (applying foreseeability test and concluding no duty existed because horrific car crashes are exceedingly rare); *Stoddart v. Pocatello Sch. Dist. #25*, 239 P.3d 784, 791–92 (Idaho 2010) (raising argument that proper investigation during school hours would have prevented after-hours death, but rejecting care standard requiring "indefinite monitoring" and finding no duty as result of lack of foreseeability of violent student criminal activity); *Beshears v. Unified Sch. Dist. No. 305*, 930 P.2d 1376, 1383 (Kan. 1997) (finding no duty on foreseeability grounds because school had no evidence of a risk of fight); *Edson v. Barre Supervisory Union #61*, 933 A.2d 200, 205–06 (Vt. 2007) (finding no duty on foreseeability grounds because school lacked specific notice of impending crime). These authorities, however, are inapposite for several reasons. First, as we have previously explained, we have adopted the duty principles of the Restatement (Third) and will not consider foreseeability, or lack thereof, in making duty determinations. *See Hoyt*, 829 N.W.2d at 776–77; *Thompson*, 774 N.W.2d at 835. Second, as we have already concluded, the duty issue was never raised below and therefore was not preserved for our review. Finally, we recognize, consistent with the

framework of the Restatement (Third), courts may use either duty or scope-of-liability determinations to limit liability in negligence cases. *See* Restatement (Third) § 29 cmt. *f*, at 500. We think it important to note, however, that where suggested limits on liability

> require careful attention to the specific facts of a case, and difficult, often amorphous evaluative judgments for which modest differences in the factual circumstances may change the outcome, scope of liability is a more flexible and preferable device for placing limits on liability.

*Id.* at 501. Use of scope of liability in this context maintains the proper role of the jury in tort cases. *Id.* We therefore cannot conclude the authorities making no-duty determinations on foreseeability grounds are persuasive here.[7]

Accordingly, we find no error in the district court's decision to submit the scope-of-liability issue to the jury.

**C.    Submission of the Challenged Negligence Specification.**
Kennedy's last contention on appeal is that the district court erred in submitting certain specifications of negligence to the jury. In particular, Kennedy contends the district court erred in instructing the jury it could find a breach of duty if Kennedy failed "to look for [D.E.], contact the office, call the police, or notify school security when she was absent from class." The submission of these specifications constituted error, Kennedy contends on appeal, because the specifications were either "outside the duty of the school" or "could not have caused the harm as a matter of law." Mitchell counters that Kennedy failed to preserve this

---

[7]Based on the fact-specific nature of scope-of-liability determinations, we also think it imprudent to speculate as to whether, had the cases finding no school liability been resolved on scope of liability instead of duty, they would have: (1) reached the same result, or (2) offered any general rule appropriate for our application here.

argument in the district court and further, that sufficient evidence supported submission of each of the specifications.

We have previously explained that objections to jury instructions must specify the matter objected to and the grounds for objection. *See Moser v. Stallings,* 387 N.W.2d 599, 603–04 (Iowa 1986); *see also* Iowa R. Civ. P. 1.924 ("[A]ll objections to giving or failing to give any instruction must be made . . . specifying the matter objected to and on what grounds."). Objections must be specific enough to put the trial court on notice of the basis of the complaint so the court may appropriately correct any errors before placing the case in the hands of the jury. *Moser,* 387 N.W.2d at 604. The only grounds we consider on appeal are those that were sufficiently specified in the objections below. *Id.*

We have also said a district court must refuse to instruct the jury on issues having no substantial evidentiary support in the record. *Greenwood v. Mitchell,* 621 N.W.2d 200, 204 (Iowa 2001). Substantial evidence is evidence that a reasonable person would find sufficient to reach a given conclusion. *Id.* In evaluating the sufficiency of evidence supporting an issue, we construe the evidence in the light most favorable to the party urging submission. *Id.* at 205.

Kennedy initially objected to the proposed negligence specifications on two grounds during the jury instruction colloquy: (1) that they were repetitious and unduly emphasized Mitchell's claim, and (2) that there was insufficient evidence to support a finding that Ms. Biedenbach failed to contact the main office upon discovering D.E.'s absence from class. The district court revised the specifications slightly in response to Kennedy's "repetitiveness" argument and concluded there was sufficient evidence to give each of the revised specifications to the jury.

Kennedy then immediately raised a new objection challenging the proposed "inclusion of a duty to call the police" among the specifications of negligence. Explaining that whether Kennedy's alleged failure to call the police was "ultimately negligent" was a jury question, the district court clearly understood Kennedy's objection as a challenge to the sufficiency of the evidence and rejected it. We conclude the mere mention of "duty" in objecting to a specification of negligence was manifestly insufficient to alert the court to the matters (factual causation and duty) that went unmentioned in Kennedy's motion for directed verdict. Our conclusion is fortified by the fact that the specifications of negligence to which the vague objection was directed were relevant to the issue of negligence (breach of duty)—not to the existence of the duty or to factual causation.

We find no error in the district court's determination that sufficient evidence supported the submission of each of the challenged specifications. A reasonable juror could find on this record that Kennedy failed to take any of the specified measures after D.E. had gone missing from school on the day in question. It was for the jury to decide as a matter of fact whether Kennedy in fact took those measures, and whether if it did not, it acted unreasonably. Accordingly, we find no error on this issue.

## IV. Conclusion.

The district court correctly denied Kennedy's motions for directed verdict and judgment notwithstanding the verdict. Kennedy failed to preserve error in the district court on the duty and factual causation issues advanced raised on appeal, and we therefore do not decide them. Finding no error in the district court's submission of the scope-of-liability

issue and the specifications of negligence, we affirm the judgment in favor of the plaintiff–appellee.

**AFFIRMED.**

All justices concur except Cady, C.J., who concurs specially and Waterman and Mansfield, JJ., who dissent.

**CADY, Chief Justice (concurring specially).**

I concur in the result reached by the majority, but write separately to express a different analysis. The school district preserved error at trial on the issue that it now argues on appeal, but those arguments do not support a new trial.

We have realigned our analysis of negligence claims consistent with the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. *Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009). Now, we proceed with an analytical model that largely accepts the proposition that a defendant has a duty of reasonable care when acting in a way that creates a risk of physical harm, and the primary legal analysis of a tort claim turns to the other elements of negligence. Importantly, any challenge to the existence of the duty element is left for the court to decide based on policy arguments and countervailing principles that might exempt people from a duty. *Id.* at 834–35. Yet, the foreseeability of harm in a specific case is not considered in such an analysis. In other words, courts no longer use the lack of foreseeability of harm in a specific case to reject the imposition of a duty of care. Instead, the lack of foreseeability of harm is initially addressed by the jury under the determination of the breach element of the tort. If harm was not reasonably foreseeable, no breach of duty can occur.

Additionally, the concept of foreseeability is injected into the tort analysis when considering the element of causation. However, we adopted new labels to address the traditional factual cause and proximate or legal cause concepts of the causation element. Now, causation is addressed under the rubric of factual cause and scope of

liability. Factual cause follows the substantial-factor test, and scope of liability serves to limit the liability of a defendant to physical harm that resulted from the risks that made the conduct negligent in the first place. *Id.* at 837–38. This was the same type of analysis accomplished by our former proximate-causation analysis. Thus, the concept of foreseeability continues to play an important role in the analysis and excludes liability under the causation element when the risk of harm was not foreseeable at the time of the defendant's conduct. *Id.* at 839.

The argument by the school district that it could not be liable because the harm occurred after school and outside school property is a duty argument. It asks the court to draw a line where its duty ends. This was the argument made at trial and on appeal by the school district. Additionally, the argument that the incident was not foreseeable is both a claim of no breach of duty and a claim that any breach did not cause the harm. The school argued the incident was beyond the scope of liability and touched on the idea that the particulars of negligence were not a substantial factor in producing the harm.

There is no question about the competing arguments made by the parties in this case. The parties presented their arguments, and the trial court had the responsibility to plug those arguments into the proper legal analysis to determine their merits. Consequently, error was preserved.

Notwithstanding, the school district only challenged, at trial and on appeal, the existence of a duty to protect students from harm after school hours and after students leave the school grounds (or are no longer engaged in an after-school activity). Yet, the challenge did not target the more specific legal duty claimed by the plaintiff that the school should have notified her that her daughter left school early, among other specific propositions. Thus, this specific duty became the law of the case

and permitted the jury to properly consider whether the duty was breached and caused harm.

I agree a school normally is not responsible for harm to students that occurs after school hours and after the students have left the school property. Once these circumstances exist, the school has relinquished control of the student back to the parents or guardians. Importantly, the rule can be expressed as a general guide because negligent conduct normally occurs close in time to the resulting harm. Thus, once students have left school for the day, any negligence of the school is normally no longer actionable. Yet, when negligent conduct continues to expose students to physical harm after school, the general guide of no liability does not apply. The breach of the duty to notify can create a risk of harm that does not end with the end of the school day.

If a high school has a legal duty to notify parents when a child skips out of school, the school can be responsible for the type of harm that occurred in this case because notice is what alerts parents that the school is no longer in control of the student and informs parents they need to resume supervision. The lack of notice deprives parents of the opportunity to resume supervision before harm occurs. Furthermore, in this case, there was evidence the plaintiff did promptly attempt to regain supervision when she learned her child was missing. This evidence impacts the analysis of causation because it reveals the plaintiff may have acted to prevent the harm if notified by the school.

The school principal did testify that parental notification when a student skips the last hour of school would be difficult and impractical for a high school to do. Yet, for the purposes of the case, the school had a duty to notify under the law of the case, and this testimony accordingly only went to the question of whether the duty was breached. The jury

was free to reject the testimony. The elements of breach and causation are fact intensive, and the jury was permitted to reach the verdict it returned.

While the school district properly argued for a legal rule that would limit its liability once school ends, that rule would not necessarily exclude liability for any negligence before the end of the school day that continued to present a risk of harm after school. Because the district court was not presented with the opportunity to determine if a high school has a specific duty to notify parents when a student skips the last hour of school, I concur in the result reached by the majority.

31

#12–0294, *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*

**WATERMAN, Justice (dissenting).**

I respectfully dissent. The majority opinion is an example of the aphorism that bad facts can make bad law. The mental disability of the fourteen-year-old special education student–victim makes this a harder case. Yet, the school district's tangential role in the events leading to her sexual assault by another student after school hours off campus is too attenuated to support liability under traditional tort law or the Restatement (Third) of Torts. This court should not extend liability to her teachers or the school district under the facts of this case: D.E. skipped her last class, lied to her mother about her after-school plans, found her boyfriend, willingly accompanied him to a convenience store, and joined him inside another student's parents' private garage where the sexual assault occurred. The majority's unprecedented expansion of school-district liability for injuries well outside school activities is unwarranted and lacks any workable limiting principle.

A saving grace today is the majority's determination that this school district failed to preserve error on the no-duty issue. This leaves the door open in future cases for school districts to argue that, as a matter of law, their duty of care is limited "to risks that occur while the student is at school or otherwise engaged in school activities." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40 cmt. *l*, at 45 (2012) [hereinafter Restatement (Third)]. I believe this bright-line rule precludes recovery against the school district here under the no-duty rule recognized in section 7(b) of the Restatement (Third). *See McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 374 (Iowa 2012) (noting section 7(a)'s general duty of care is "subject to 'an articulated countervailing principle or policy' " in section 7(b), which

" 'may be reflected in longstanding precedent' " (quoting Restatement (Third) § 7(b) cmt. *a*, at 77–78 (2010))).[8]

The majority cites no case from Iowa or elsewhere holding that a school district can be held liable when a student who skips school ends up being sexually abused by a fellow student away from the school premises and after the end of the school day. I disagree with the majority's determination that the school district failed to preserve error on the no-duty question in its motion for directed verdict, although the question is close. Defense counsel argued the facts supporting a no-duty ruling and argued there was no liability as a matter of law. But he failed to use the word "duty" and did not cite section 7(b) or comment *l* to section 40 of the Restatement (Third) in his directed verdict motion. Nevertheless, he clearly intended to include a no-duty ground. I would be more forgiving as to the specificity required to avoid an involuntary waiver on the interrelated issues of duty, breach, causation, and scope of liability. After all, our court only recently adopted the Restatement (Third) scope-of-liability approach, when neither side raised or briefed the issue, in *Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009). So why not reach the no-duty issue today when it is fully briefed by these parties? In any event, I would hold that the school district's motion for

_____

[8]The decision of our court of appeals reversing a directed verdict for the defendant in *Hill v. Damm*, 804 N.W.2d 95 (Iowa Ct. App. 2011), is consistent with this bright-line rule. There, a school bus driver dropped a thirteen-year-old student off at the wrong stop despite specific, credible warnings from her mother to avoid that stop to prevent contact with a pedophiliac neighbor. *Id.* at 96–97. The mistake by the driver predictably put the child directly into harm's way—she was abducted by the neighbor at that stop and later murdered. *Id.* at 97. A school district's duty of care extends to transporting students to a safe exit from a school bus. *See Burton v. Des Moines Metro. Transit Auth.*, 530 N.W.2d 696, 700 (Iowa 1995). By contrast, the victim in this case was not mistakenly transported by school bus to a foreseeably dangerous location; rather, she skipped school on her own without any notice to the school of a reasonably foreseeable third-party threat to her safety.

directed verdict based upon scope of liability—what we used to call proximate cause—should have been granted and that there was insufficient evidence of negligence to submit the case to the jury.

The victim's special education status does not get this case to the jury. Federal law requires that special education students be educated in the "[l]east restrictive environment" and "[t]o the maximum extent appropriate . . . with children who are not disabled." Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1412(a)(5) (2006). *See generally* Ralph D. Mawdsley, *Standard of Care for Students with Disabilities: The Intersection of Liability Under the IDEA and Tort Theories*, 2010 B.Y.U. Educ. & L.J. 359 (2010). The idea is to mainstream the student. That was the approach taken with D.E. by the school district. A team of educators and D.E.'s mother had developed an Individualized Education Program (IEP) to accommodate her specific needs. *See* 20 U.S.C. § 1414. Special education students are subject to the same school procedures as any other student unless the IEP provides differently. D.E.'s IEP did not require any escort for her between classes or leaving school. D.E.'s IEP subjected her to the same attendance requirements as other students and required no special notification to her mother if she missed a class. D.E.'s mother never asked the school to notify her immediately if D.E. skipped class. No claim is made that any act or omission of the school district violated the IDEA or D.E.'s IEP. The district generally owes no duty to a special education student to provide services beyond those specified in the IEP. *Cf. Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366–67 (6th Cir. 2012) (affirming summary judgment for school district on sexual assault claim because it owed no duty to supervise disabled student beyond period specified in IEP); *Worthington v. Elmore Cnty. Bd. of Educ.*, 160 F. App'x 877, 881–82

(11th Cir. 2005) (affirming summary judgment for school district on sexual assault claim because IEP did not require additional adult supervisor on bus transporting special-needs student). In fact, plaintiffs' argument that the school should have restricted D.E.'s movements between classes after fifth period would likely have resulted in a violation of federal law, unless the school restricted the movement of *all* students. Thus, D.E.'s mental disability does not support extending the school district's liability to reach this off-campus, after-hours, private assault.

The facts, viewed in the light most favorable to the verdict, do not support a finding of negligence. D.E. was a freshman Level II special education student at Kennedy High School, which had 1834 students during the 2007–2008 school year. D.E. suffered from mild mental retardation. Her reading was at the third-grade level and her math skills were at the fifth- or sixth-grade level. D.E. took her academic subjects in special education classrooms and subjects like physical education and ceramics with the general school population. The special education classes were generally smaller than regular classes and usually contained an additional instructor, a teacher's associate.

Although the majority says that D.E. was "rarely, if ever, without direct adult supervision because of her diminished capacity," the record does not support this. In fact, like other general education and Level II special education students, D.E. went between classes on her own, going outside the building when that was the most convenient route. Also, on the day in question, D.E.'s mother had given D.E. permission to ride the bus to another special education student's house after school. D.E.'s IEP stated, "[D.E.] is capable of performing daily living skills on her own except for managing her finances independently."

Instead of riding the bus to that friend's house that day, D.E. and the friend walked out of the school building one class period early. They met up with a senior, M.F., another special education student. No teacher saw them leave together. M.F. regarded D.E. as his girlfriend and said she wrote him a note earlier that day saying she wanted to have sex with him. According to D.E., they were picked up by a fourth student who was driving a car while they were walking along the street some distance from the school. The fourth student drove them to M.F.'s grandparents' house, where various adults were present. After about twenty minutes, M.F. and D.E. left the grandparents' house. They went to a gas station where they bought a condom. They then walked to the home of yet another friend of M.F.'s, who was also a special education student. At about 4:10 or 4:15 p.m., approximately one and a half hours after the end of the school day, M.F. and D.E. entered the garage of M.F.'s friend's house. M.F. had sex with D.E. while M.F.'s friend was shooting BBs at her. M.F. was nineteen and D.E. was fourteen at the time; M.F. subsequently was charged with and pled guilty to third-degree sexual abuse.

There is no evidence that M.F.'s assault on D.E. was reasonably foreseeable to the school district. Her teacher saw D.E. and M.F. touching affectionately and romantically, behavior that is not uncommon at a high school. Her teacher knew D.E. skipped the last class period and without phoning the mother during class, recorded her absence to trigger parental notification that evening. The majority concludes these facts justify imposing liability on the district for M.F.'s assault on D.E. I disagree. The IEP did not require extra supervision for D.E. or immediate notice to her mother if she missed a class. D.E. lied to her mother about her after-school whereabouts; her intended liaison with M.F. was likely to

occur somewhere, sometime whether or not she skipped her last class. She was not abducted from school. The school's conduct had no more than a " 'serendipitous causal connection' " to M.F.'s sexual assault on D.E. hours later and miles away, which places his criminal act outside the school's scope of liability. *See Royal Indem. Co. v. Factory Mut. Ins. Co.,* 786 N.W.2d 839, 851–52 (Iowa 2010) (noting the defendant's conduct must *increase* the risk of harm to fall within the scope of liability and that a mere "serendipitous causal connection" is insufficient (quoting Restatement (Third) § 30 cmt. *b,* at 544)).

The majority relies on cases from other jurisdictions that are readily distinguishable as involving a breach of the duty of care at the time of dismissal of young children. In *Jerkins v. Anderson,* the New Jersey Supreme Court affirmed an appellate decision reversing summary judgment for the school district when a nine-year-old student was struck by a car walking several blocks from school after an early dismissal. 922 A.2d 1279, 1281 (N.J. 2007). The *Jerkins* court focused on the school's "duty of reasonable care to supervise children at dismissal" and noted the father (who arrived at the normal closing time to pick up his child) claimed he was not notified the children would be released early. *Id.* at 1281–82. The court concluded "the sparse record . . . may not foreclose liability." *Id.* at 1291. The court cautioned that a "school district's responsibility has temporal and physical limits," and that schools are not "guarantors of students' safety with respect to all activities during or after dismissal." *Id.* The court focused on the elementary school's absence of a dismissal policy. *Id.* at 1288–90.

Because D.E.'s IEP permitted her to go to and from school and between classes unescorted, *Jerkins* is inapposite. So, too, is *Perna v. Conejo Valley Unified School District,* 192 Cal. Rptr. 10 (Ct. App. 1983).

In that case, two students kept late by a teacher after school were struck by a car at the adjacent intersection after the shift ended for the crossing guards there. *Id.* at 10–11. The court held a jury question existed as to the "district's alleged failure to exercise due care in supervising the plaintiffs *on school premises.*" *Id.* at 12.

Equally inapposite is the pair of Louisiana cases cited by the majority. Both found the school district could be liable for the school's negligent supervision of six-year-olds at the time of dismissal. In *Gary v. Meche*, an unsupervised six-year-old ran into the side of a truck that was driving in front of the school at dismissal time. 626 So. 2d 901, 902 (La. Ct. App. 1993). In *Sutton v. Duplessis*, a six-year-old was placed in the school office to wait for her mother. 584 So. 2d 362, 363–64 (La. Ct. App. 1991). The child wandered off unnoticed by the secretary assigned to watch him and went to a friend's home a block away where the parent sent him walking back to school; he then darted into the path of a car. *Id.* at 364. The court held "the school authorities should have foreseen that a six-year-old might disobey orders not to leave, especially when he realized that no adult was actually watching him." *Id.* at 366.

The majority overlooks recent Louisiana precedent that is more factually analogous. In *Huey v. Caldwell Parish School Board*, a sixteen-year-old female student contrived excuses to convince the school bus driver to let her off early for clandestine sexual liaisons. 109 So. 3d 924, 926 (La. Ct. App. 2013). In affirming summary judgment for the school board, the appellate court concluded "the concept of legal cause is necessary to cut off liability at some point. In this case, too much has intervened, and this risk is not within the scope of [the school's] duty." *Id.* at 930. The same reasoning applies here.

The best case for the majority is *Doe v. Escambia County School Board*, 599 So. 2d 226 (Fla. Dist. Ct. App. 1992). That court reversed summary judgment for the school to reinstate claims arising from the off-campus rape of a fourteen-year-old mentally disabled girl based on a factual dispute over whether the school had negligently supervised the school building and parking lot where, during her lunch period, "a male student took her by the arm, walked her out to the school parking lot, put her in a car, and took her to a house." *Id.* at 227–28. Three teachers were aware the victim was acting strangely that morning "because she twice changed out of her conservative dress into a mini-skirt. Each time a teacher compelled her to change back into the dress she initially wore to school." *Id.* at 227. Such behavior warranted more supervision. Another Florida appellate court "distinguish[ed] *Doe* because the student in that case was abducted rather than having left voluntarily." *Kazanjian v. Sch. Bd.*, 967 So. 2d 259, 266, 267 (Fla. Dist. Ct. App. 2007) (affirming summary judgment for school district on claim by estate of student killed in an off-campus car accident after skipping school). *Doe* is inapposite. D.E. exhibited no unusual behavior warranting greater supervision at school and skipped her last class that day voluntarily—she was not abducted at school by M.F.

The great weight of authority holds as a matter of law that schools are not liable for assaults occurring off campus after school hours and outside of school activities. The majority attempts to sidestep these cases because they were decided "using the old duty framework of the Restatement (Second)" and the duty issue was not preserved below. But, as the majority acknowledges, "consistent with the framework of the Restatement (Third), courts may use either duty or scope-of-liability determinations to limit liability in negligence cases." In *McCormick,* we

discussed how the law of duty remains intact in important ways after *Thompson*:

> Historically, the duty determination focused on three factors: the relationship between the parties, the foreseeability of harm, and public policy. [*Thompson*, 774 N.W.2d] at 834. In *Thompson*, we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent. *Id.* at 835. But we did not erase the remaining law of duty; rather, we reaffirmed it. *Id.* at 834–36. *In short, a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion.*

*McCormick*, 819 N.W.2d at 371 (emphasis added). We reiterated "that our previous law of duty was otherwise still alive and well." *Id.* We affirmed summary judgment for the defendant electrical subcontractor under the control rule that predated *Thompson.* *Id.* at 375; *see also Feld v. Borkowski*, 790 N.W.2d 72, 76–77 & n.1 (Iowa 2010) (applying contact-sports rule that predated *Thompson* to tort claim arising from injury to player during high school intramural softball game because the Restatement (Third) "expresses the notion that a reasonable-care duty applies in each case *unless* a special duty, like the contact-sports exception, is specifically recognized" (citing Restatement (Third) § 7, cmt. *a*, at 77)). It is true the Restatement (Third) provides a new analytic approach, but it is wrong to conclude cases previously subject to dismissal by summary judgment now must go to the jury. "Our court's recent adoption of sections of the Restatement (Third) of Torts is not the death knell for summary judgments in negligence cases." *Hoyt v. Gutterz Bowl & Lounge, L.L.C.*, 829 N.W.2d 772, 783 (Iowa 2013) (Waterman, J., dissenting) (citing *McCormick*, 819 N.W.2d at 371–75).

I believe the numerous no-liability school cases would have the same outcome under the Restatement (Third) because the harm to the

plaintiff was outside the scope of the school's liability and because of the limited nature of the school's duty under section 40, comment *l.* A defendant's conduct may fall outside the scope of liability when, as here, it does not increase the risk of harm to plaintiff, or because the intervening criminal act was not reasonably foreseeable. *See* Restatement (Third) § 34 cmt. *e,* at 589 ("In cases in which the source of the risk is an intervening act, the foreseeability of the intervening act will determine whether an actor's liability extends to any harm that occurs."). In *Royal Indemnity*, we observed:

> The concepts embodied in the Restatement (Third), however, have largely been adopted from various sections of the Restatement (Second). *See* [Restatement (Third)] § 29 cmt. *a,* at 493 . . . . (stating that there was a limit on the scope of liability for tortious actions under the Restatement (Second), however, components of this limit were expressed in several different sections throughout the Restatement (Second)). . . . *We also note that the result under a Restatement (Second) analysis would be the same.*

786 N.W.2d at 849 (emphasis added). The Restatement (Third) does not tilt the playing field; rather, as we noted in *Royal Indemnity,* the result under the Restatement (Second) would be the same.

Unlike the majority, I would not disregard persuasive authority from other jurisdictions merely because those states have not joined Iowa in adopting the scope-of-liability approach articulated in the Restatement (Third). *See, e.g., Hill v. Safford Unified Sch. Dist.,* 952 P.2d 754, 756, 761 (Ariz. Ct. App. 1997) (holding the school not liable for an after-hours, off-premises student shooting because "as a matter of law [the school] could not have taken reasonable measures that probably would have prevented the attack" (citation and internal quotation marks omitted)); *Concepcion v. Archdiocese of Miami,* 693 So. 2d 1103, 1105–06 (Fla. Ct. App. 1997) (affirming summary judgment for school district on

negligence claims arising from off-campus, after-hours fight between students of rival schools); *Beshears v. Unified Sch. Dist. No. 305*, 930 P.2d 1376, 1378, 1383 (Kan. 1997) (affirming summary judgment for school district on claims it failed to prevent "an after school hours, off school premises . . . prearranged fight between two high school sophomores"); *Maldonado v. Tuckahoe Union Free Sch. Dist.*, 817 N.Y.S.2d 376, 377–78 (App. Div. 2006) (affirming summary judgment for school district dismissing claims it failed to protect student attacked at night at her home by a suspended student who had threatened her at school); *Edson v. Barre Supervisory Union # 61*, 933 A.2d 200, 202–04 (Vt. 2007) (holding that a school has a duty "to protect students only from foreseeable risks" and finding the off-the-premises murder of a student after she skipped class was unforeseeable).

The Vermont Supreme Court recognized that to impose liability on schools for crimes occurring when a troubled student skips school would result in higher security costs that divert resources from the primary mission of schools—education:

> Elevating the duty of care to ensure that students with known truancy, drug abuse, or other behavioral problems remain on campus would not only be financially and logistically burdensome, but would likely detract from schools' primary purpose by diverting significant resources from education to security. Under the circumstances of this case, nothing short of continuous, immediate supervision would have prevented DeAndra from voluntarily leaving school and going to Martin's home. . . . Vermont schools are neither equipped nor expected to provide such constant supervision to students, even those with a troubled history.

*Edson*, 933 A.2d at 206 (citation omitted). This is equally true of Iowa schools. In *Brokaw v. Winfield–Mt. Union Community School District,* we admonished that " 'excessive precautions' " should not be required to avoid the risk of harm from even " 'somewhat foreseeable' " improper acts

of third parties. 788 N.W.2d 386, 392, 393–94 (Iowa 2010) (quoting Restatement (Third) § 19, cmts. *g–h,* at 220–21) (affirming bench trial judgment for school on claims arising from student assault during basketball game). The majority today disregards that admonition by requiring high schools to take excessive precautions.

Teachers can be teaching or contacting parents, but cannot do both effectively at the same time. The principal of Kennedy High School, Mary Wilcynski, testified at trial as to why it would be unrealistic to require a teacher to phone the parent when a student is not in class:

> It's unrealistic to assume that a teacher can stop helping kids learn and being in charge of the classroom, go to the phone and make—figure out the phone number, figure out where the parent is, working or at home or whatever, call them and say, I see that it's ten to two and your child is not in my class. The student might have gotten a pass to come to the office. The student might have gotten a pass to go somewhere else. An administrator might be talking to them. They might be seeing their counselor. There can be a myriad of different places they could legitimately be. So for a teacher to say—to try to contact a parent on the immediate absence is unrealistic.

Why should our court be the first in the nation to hold a school can be found negligent for failing to immediately notify the parent of a high school student that she is not in class last period? I would not impose this unrealistic burden on teachers, particularly when it is entirely speculative whether D.E.'s plan to meet privately with M.F. would have been thwarted by her mother if she had received a phone call earlier.

It is not surprising that other courts refuse to impose liability on schools for injuries occurring when high school students skip classes. In *Kazanjian,* several eleventh graders skipped school and were involved in

a fatal car accident. 967 So. 2d at 261–62. In affirming summary judgment for the school district, the court stated:

> [W]e hold that no duty exists. As the record demonstrates, high school students routinely skip school yet, as the paucity of reported cases shows, horrific car crashes while skipping school are exceedingly rare. Placing liability on the school board for off campus automobile accidents involving high school students would encourage the imposition of hyper-restrictive conditions on high school campuses. The off-campus dangers confronting high school students are risks that should be confronted by students and their parents. We conclude that in the context of a negligence cause of action brought on behalf of a student injured off campus, a school may not be held liable for injuries suffered by a student who has violated the school's campus attendance policies.

*Id.* at 268 (citation omitted).

Another Florida appellate court observed that a school's duty of supervision ends when the student leaves school, and to hold otherwise makes schools insurers of student safety until they arrive at home:

> We fully concur with *Oglesby*'s holding that a school has no duty to supervise off-campus, non-school related activities occurring during non-school hours. Any holding to the contrary would essentially make school officials insurers of all students' safety until the students return home each day. We decline to place such an unreasonable and onerous burden on school officials. At some point, we believe that a school's obligation of reasonable supervision must come to an end and the parent or guardian's duty of supervision must resume. That logical point, we think, should be when the student leaves the school's premises during non-school hours and is no longer involved in school-related activities.

*Concepcion*, 693 So. 2d at 1105 (citing *Oglesby v. Seminole Cnty. Bd. of Pub. Instruction*, 328 So. 2d 515, 516–17 (Fla. Dist. Ct. App. 1976)).

This case involves no preventable criminal act *at school* such as an abduction. The majority fails to articulate any persuasive reason to diverge from the well-settled authority enforcing a bright-line rule limiting school liability to injuries occurring on school grounds or during

school activities. The bright-line rule makes sense because a school cannot control the conduct of teenagers after hours, off-campus, outside of a school activity with no teacher present. *See McCormick,* 819 N.W.2d at 374 (noting rule that liability follows control makes sense because "[t]he party in control . . . is best positioned to take precautions to identify risks and take measures to improve safety"). I would continue to apply that rule in our state, consistent with comment *l* to section 40 of the Restatement (Third) of Torts.

For the foregoing reasons, the defendant school district was entitled to a directed verdict.

Mansfield, J., joins this dissent.